JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, peticionaria, *v.* ASOC. CONDÓMINOS PLAYA AZUL I, ETC., demandadas.

*Número:* CE-85-704 *Resuelto:* 5 de marzo de 1986

---

*Juan Antonio Navarro,* abogado de la peticionaria; *Ángel L. Morales Rodríguez,* abogado de las recurridas.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

La Junta de Relaciones del Trabajo de Puerto Rico (en adelante la Junta) acude ante este Foro para que en virtud de lo dispuesto en el Art. 9(2)(a) de la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945, según enmendada, 29 L.P.R.A. sec. 70(2)(a), pongamos en vigor su orden de 27 de marzo de 1985 contra las Asociaciones de Condóminos de los Edificios Playa Azul I, II y III (en adelante las Asociaciones), y la Asociación Recreativa y Cultural de los Condóminos Playa Azul, Inc. (en adelante la Corporación).

La decisión de la Junta ordenó a las querelladas que cesaran y desistieran de intervenir, restringir y coercer a sus empleados en el ejercicio de los derechos gremiales; desalentar la

matrícula de cualquier organización obrera mediante discriminación en el empleo, despido o la tenencia de empleo u otros términos o condiciones de empleo; también ordenó reponer al Sr. Agustín Castillo en su empleo y el pago atrasado de su sueldo, más los intereses legales, y las demás providencias de rigor.

Mediante resolución le requerimos a las querelladas que mostraran causa por la cual no se les debería considerar un solo patrono a los fines del Art. 2 (2) de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 63 (2) y poner, a su vez, en vigor la orden de la Junta.

Las querelladas han comparecido señalando ocho (8) errores, los cuales se pueden resumir en dos planteamientos básicos. Primero, que la Junta erró al determinar que los hechos específicos [1] de este caso configuran una práctica ilícita de trabajo según lo dispuesto en el Art. 8 (1) (a) y (c) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 69 (1) (a) y (c), y segundo, que erró al determinar que todas las querelladas, a pesar de ser patronos distintos, incurrieron en dicha práctica.

## I

Las Asociaciones querelladas son los órganos directivos de los edificios Playa Azul I, II y III, según la legislación de propiedad horizontal. Cada una de las Asociaciones trabaja en forma independiente, con su propia estructura financiera, directores y personal, incluyendo guardias de seguridad, debidamente unionados y con convenios colectivos distintos. Cada

---

[1] Hemos examinado el récord administrativo y encontramos que las conclusiones de hecho de la Junta están ampliamente sostenidas por la evidencia; por lo tanto, no intervendremos con ellas, son concluyentes y definitivas. *J.R.T.* v. *Marex Const. Co., Inc.*, 103 D.P.R. 135, 140 (1974); *Junta Rel. Trabajo* v. *Simmons Int'l, Ltd.*, 78 D.P.R. 375, 386 (1955); *Junta Rel. Trabajo* v. *Junta del Muelle*, 71 D.P.R. 154 (1950); *Rivera* v. *Junta Relaciones del Trabajo*, 70 D.P.R. 5 (1949), y *A.F.F.* v. *J.R.T.*, 99 D.P.R. 911 (1971).

Asociación genera sus propios fondos de las cuotas de mantenimiento de los condóminos, los cuales destina a la administración y mantenimiento del edificio correspondiente.

La Corporación querellada, (²) a su vez, es una Corporación sin fines de lucro, creada para administrar, mantener y embellecer las facilidades recreativas que usan en común los dueños de los Condominios Playa Azul I, II y III. Su Junta de Directores la componen miembros de las Juntas de Directores de las Asociaciones de los tres condominios. El Presidente se elige por un término de dos años de entre los presidentes de las Juntas de Directores de las tres Asociaciones. (³)

---

(²) Esta Corporación, sin fines de lucro y organizada bajo las leyes de Puerto Rico, administra las facilidades recreativas comunes de los tres edificios, tales como piscinas, canchas, parque infantil, centro cultural y demás facilidades recreativas. Los terrenos administrados por la Corporación eran propiedad de la corporación que desarrolló el complejo Playa Azul, Condado Center, Inc. Posteriormente, esas facilidades fueron cedidas y/o donadas a la Administración de Parques y Recreo Públicos de Puerto Rico, quien, a su vez, cedió la administración de las mismas a la Corporación, en octubre de 1971; *Exhibit* 5 del patrono.

En ninguna etapa de los procedimientos se ha cuestionado, y tampoco está ante nuestra consideración, la validez del mecanismo utilizado en este caso para administrar y mantener facilidades de uso común del complejo de condominios y la personalidad jurídica de esta corporación, según lo resuelto en *Arce v. Caribbean Home Const. Corp.*, 108 D.P.R. 225, 252–254 (1978).

En *Junta Rel. Trabajo v. Club Deportivo*, 84 D.P.R. 515, 521 (1962), expresamos "que el mero hecho de que una asociación o corporación se haya organizado sin fines de lucro no la coloca fuera del ámbito de la legislación sobre relaciones del trabajo".

(³) Durante los primeros dos años el Presidente de la Corporación fue el Presidente de la Asociación del Condominio III; el Vicepresidente, el Presidente de la Asociación del Condominio II, y el Secretario, el Presidente de la Asociación del Condominio I; en el siguiente período de dos años el Presidente de la Corporación lo fue el Presidente de la Asociación II; el Vicepresidente, el Presidente de la Asociación del Condominio I, y el Secretario, el Presidente de la Asociación del Condominio III; en el último período de dos años el Presidente, Vicepresidente y Secretario de la Corporación lo fueron los Presidentes de las Asociaciones de los Condominios I, II y III, respectivamente, y de acuerdo con ese patrón se ha seguido rotando la junta directiva de dicha Corporación.

El Presidente de la Junta de Directores de la Corporación designa un administrador quien contrata el personal necesario para llevar a cabo los deberes y responsabilidades que le asigna el reglamento. La práctica seguida por la Corporación es contratar al administrador del edificio del cual es condómino el Presidente. A este administrador se le pagan $100 mensuales adicionales a su sueldo como administrador de dicho edificio; lo mismo sucede con la secretaria, a quien se le pagan $50 mensuales adicionales. Esta compensación adicional proviene de la Corporación. Tanto el administrador como la secretaria ejercen sus funciones en el condominio al que pertenecen, de tal manera, que el administrador de turno de la Corporación es responsable del personal de la misma, así como del personal del condominio en el cual también ocupa el puesto administrativo. El administrador y la secretaria de la Corporación utilizan los materiales y facilidades de oficina de la Asociación de su edificio.

La Corporación genera sus fondos de las aportaciones mensuales que hacen las Asociaciones. Estos fondos se mantienen en una cuenta bancaria distinta a las de las Asociaciones. Las reuniones de la Junta de Directores de la Corporación se llevan a cabo el primer domingo del mes. Terminada esta reunión, se realizan allí mismo las reuniones de las Juntas de Directores de cada una de las Asociaciones.

El Sr. Agustín Castillo, el empleado despedido, comenzó a trabajar con la Corporación como guardia de seguridad —a tiempo parcial— desde julio de 1981. Al momento de su despido el 27 de septiembre de 1982, era el único guardia de seguridad empleado por la Corporación. Ocasionalmente sustituyó a guardias de seguridad de cualesquiera de los tres edificios, que estaban disfrutando de vacaciones; también trabajó turnos más continuos para el Condominio Playa Azul II. En febrero de 1982 el señor Castillo pasó a rendir servicios con carácter regular a la Corporación prestando sus servicios durante la noche.

La Corporación también empleaba un guardia de seguridad —en ocasiones el señor Castillo— para que estuviera en el portón que da acceso a la playa; este guardia rendía servicios sólo los fines de semana y durante el verano. Cada Asociación empleaba los guardias que prestaban servicios en el edificio correspondiente todo el día, en tres turnos. En ocasiones de emergencia cada guardia podía ayudar a los guardias de cualesquiera de los otros edificios. El portón eléctrico que da acceso al estacionamiento de los tres edificios, al igual que el portón de acceso a la playa era vigilado por los guardias empleados por la Corporación para beneficio de los condóminos de los tres edificios.

Desde que el señor Castillo fue empleado en 1981 hasta agosto de 1982 la presidencia y administración de la Corporación estuvo bajo la responsabilidad del Presidente y administrador del Condominio Playa Azul I. Se le pagaba el mismo salario que el negociado por la Unión Fraternal de Guardias de Seguridad (en adelante Unión) para los guardias de seguridad de ese Condominio. Durante los meses de febrero a septiembre de 1982 surgieron varias conversaciones entre el señor Castillo, el Sr. Lorenzo Sierra Reyes, Presidente de la Unión y algunos directores o representantes de la Corporación y los Condominios sobre la solicitud del señor Sierra para que el señor Castillo perteneciera a dicha Unión y el deseo de éste de así hacerlo.

La Unión representaba a los guardias de seguridad de los tres Condominios, teniendo cada una de las Asociaciones su propio convenio colectivo. La posición de la Corporación y las Asociaciones con respecto al señor Castillo era que éste no podía pertenecer a la Unión porque trabajaba para la Corporación que era una entidad independiente y no tenía unión. A pesar de esto, en marzo de 1982, el señor Castillo comenzó a pagar, por su cuenta, las cuotas de la Unión. En agosto de 1982 la presidencia y administración de la Corporación pasó al Presidente y administrador de la Asociación de Condóminos

Playa Azul III, el Sr. José Sánchez. Con motivo de este cambio se le notificó al señor Castillo que su salario por hora se había rebajado en la cantidad de cinco (5) centavos, para equipararlo al salario convenido con la Unión para los guardias de seguridad de dicho Condominio. El señor Castillo se quejó al Presidente de la Unión quien se reunió con el señor Sánchez para discutir la rebaja de sueldo; éste quedó en discutir el asunto con la Junta de Directores de la Corporación.

Al día siguiente cuando el señor Castillo fue a trabajar se encontró con una carta de despido, donde se le indicaba que por razones económicas se prescindía de sus servicios. Unos días más tarde se encontró con la entonces asesora legal del señor Sánchez y ésta le manifestó que de no haber actuado en la forma en que lo hizo le hubiesen ofrecido una oportunidad como guardia de seguridad en el Condominio Playa Azul III, donde había surgido una vacante.

Los acontecimientos ocurridos con posterioridad al despido claramente demuestran que éste no se debió a dificultades económicas. Luego del despido se contrataron guardias de seguridad a tiempo parcial para la Corporación y un guardia de seguridad para el Condominio Playa Azul III. A pesar de que los testigos del patrono reconocieron que el señor Castillo era un buen empleado, no se le ofrecieron estas oportunidades de trabajo.

Con motivo de este despido, el 27 de septiembre de 1982 la Unión presentó, ante la Junta, cargo por violación de convenio colectivo contra la Junta de Directores de la Asociación de Condóminos Playa Azul III. El 8 de junio de 1983 la Junta emitió una resolución en la cual determinó que de la investigación realizada surgía que existía causa probable de práctica ilícita de trabajo contra las Asociaciones de Condóminos Playa Azul I, II y III y la Corporación. El 11 de julio de 1983 a base del cargo presentado por la Unión y la resolución de la Junta se presentó la querella que precedió a la orden que hoy

revisamos contra las Asociaciones de Condóminos de Playa Azul I, II y III y la Corporación. (⁴)

## II

Pasemos ahora a considerar si a la luz de los hechos de este caso, a las querelladas, las Asociaciones y a la Corporación, se les puede considerar un solo patrono a los fines del Art. 2 (2) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 63 (2). (⁵)

■■■ La doctrina de un solo patrono al igual que las de descorrer el velo corporativo (álter ego) y del patrono sucesor (*successorship*) se desarrollaron jurisprudencialmente por los tribunales federales y la Junta de Relaciones del Trabajo Nacional para proteger el derecho de los obreros a organizarse y a negociar colectivamente con sus patronos, cuando condiciones económicas, hostilidad contra las uniones, o una combinación de ambas cosas hace que un patrono estructure o restructure su empresa de forma tal que se afectan adversamente estos derechos. (⁶)

---

(⁴) Art. 9 (2) (g) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 70 (2) (g).

(⁵) La redacción de la definición de patrono en nuestra ley, aunque similar a la redacción de su contraparte federal, 29 U.S.C. sec. 152 (2), es más amplia y flexible. Véase: *Junta Rel. Trabajo* v. *Club Deportivo*, supra, págs. 523–525. La Ley de Relaciones del Trabajo Federal de 1947 enmendó la definición de "patrono" bajo la Ley Wagner, para hacer esta definición un poco más limitada. 1947 U.S. Code Cong. Serv. 1136, 1137. Bajo esa redacción más limitada se desarrolló la doctrina de un solo patrono. En general, véase 2 *The Developing Labor Law* 1440 y ss. (Morris 2da ed. 1983). Nada impide que a base de la definición más flexible de nuestra ley se adopte también la doctrina de un solo patrono.

El Art. 2 (2) de nuestra ley dispone: "El término 'patrono' incluirá ejecutivos, supervisores y a cualquier persona que realizare gestiones de carácter ejecutivo en interés de un patrono directa o indirectamente, . . .". 29 L.P.R.A. sec. 63 (2).

(⁶) En lo que respecta a la doctrina de descorrer el velo corporativo (álter ego), en el campo laboral, y como norma general, ésta se utiliza cuando una corporación toma el control de otra entidad que usualmente

■ Tanto la doctrina de descorrer el velo corporativo (álter ego) como la del patrono sucesor (*successorship*) han encontrado eco en nuestra jurisprudencia. *J.R.T.* v. *Marex Const. Co., Inc.*, 103 D.P.R. 135, 142–143 (1974); *Beaunit of Puerto Rico* v. *J.R.T.*, 93 D.P.R. 509 (1966); *J.R.T.* v. *Coop. Azucarera*, 98 D.P.R. 314 (1970). Al evitar que los obreros se queden sin remedios luego de reorganizaciones corporativas,([7]) estas doctrinas protegen importantes valores: la paz

---

desaparece y se demuestra que ese cambio de mando tenía propósitos ilegales, constituiría una violación de una política pública, se perpetuaría una injusticia o un fraude o se incumpliría con una obligación —en la mayoría de los casos un convenio colectivo. Véanse: *J.R.T.* v. *Marex Const. Co., Inc.*, supra, págs. 142–143; *Fugazy Continental Corp.* v. *N.L.R.B.*, 725 F.2d 1416, 1419 (Cir. D.C. 1984); *Penntech Papers, Inc.* v. *N.L.R.B.*, 706 F.2d 18, 24 (1er Cir. 1983), *cert.* denegado, 464 U.S. 892 (1983); Nota, *Bargaining Obligations after Corporate Transformations*, 54 N.Y.U.L. Rev. 624, 638 (1979). El análisis bajo esta doctrina requiere que se demuestren propósitos o intentos de cometer actos ilegales, *Penntech Papers, Inc.* v. *N.L.R.B.*, supra, pág. 24; *Fugazy Continental Corp.* v. *N.L.R.B.*, supra, pág. 1419.

La Junta equivocadamente aplicó a este caso la doctrina de descorrer el velo corporativo (álter ego). Los hechos en el récord de la Junta no demuestran que la estructura de las tres Asociaciones y la Corporación fuera creada con fines ilegales. En general, sobre la doctrina de descorrer el velo corporativo en Puerto Rico véanse: *Ab Intestato Balzac Vélez*, 109 D.P.R. 670 (1980); *González* v. *San Just Corp.*, 101 D.P.R. 168 (1973); *Fleming* v. *Toa Alta Develop. Corp.*, 96 D.P.R. 240 (1968); *Sucn. Santaella* v. *Srio. de Hacienda*, 96 D.P.R. 442 (1968); *San Miguel Fertil. Corp.* v. *P.R. Drydock*, 94 D.P.R. 424 (1967); *South P.R. Sugar Corp.* v. *Junta Azucarera*, 88 D.P.R. 43 (1963); *J. E. Candal & Co.* v. *Rivera*, 86 D.P.R. 508 (1962).

De otra parte, la doctrina del patrono sucesor (*successorship*) se usa cuando hay una venta o transferencia de activos o reorganización de un negocio, aunque no haya habido expresiones de hostilidad contra la unión por parte del patrono o una continuidad en el interés financiero o control gerencial. Lo que se requiere es que haya similaridad sustancial en la operación de la empresa y continuidad en la identidad de la empresa antes y después del cambio; la nueva entidad bajo estas circunstancias y al amparo de la doctrina del patrono sucesor (*successorship*) se puede hacer responsable de las obligaciones laborales de su predecesora. *Beaunit of Puerto Rico* v. *J.R.T.*, 93 D.P.R. 509 (1966); *J.R.T.* v. *Coop. Azucarera*, 98 D.P.R. 314 (1970); D. Fernández, *La Junta de Relaciones del Trabajo de Puerto Rico y el Sector Público*, 43 Rev. Jur. U.P.R. 295, 404–407 (1974); *John Wiley & Sons* v. *Livingston*, 376 U.S. 543, 549 (1964).

([7]) En *United Telegraph Wkrs., AFL–CIO* v. *N.L.R.B.*, 571 F.2d 665, 670 (Cir. D.C. 1978), en la opinión disidente acertadamente se expresa

industrial, el derecho a la negociación colectiva y el derecho de propiedad del patrono. Nota, *Bargaining Obligations after Corporate Transformations*, 55 N.Y.U.L. Rev. 624, 655 (1979).

■ A tono con este enfoque se ha determinado que la doctrina de un solo patrono aplica cuando dos o más patronos cumplen los siguientes criterios: 1) operaciones interrelacionadas; 2) control centralizado de las relaciones laborales; 3) administración común, y 4) propiedad común. *Radio Union* v. *Broadcast Serv.*, 380 U.S. 255, 256 (1965); *Penntech Papers, Inc.* v. *N.L.R.B.*, 706 F.2d 18 (1er Cir. 1983); *Fugazy Continental Corp.* v. *N.L.R.B.*, 725 F.2d 1416 (Cir. D.C. 1984); *Soule Glass and Glazing Co.* v. *N.L.R.B.*, 652 F.2d 1055, 1075 (1er Cir. 1981); *N.L.R.B.* v. *Don Burgess Const. Corp.*, 596 F.2d 378, 384 (9no Cir. 1979); *United Telegraph Wkrs., AFL–CIO* v. *N.L.R.B.*, 571 F.2d 665, 667, 670 (Cir. D.C. 1978); 2 *The Developing Labor Law* 1440 y ss. (Morris 2da ed. 1983); Nota, *op. cit.*, págs. 625, 631 y ss. [8] Ninguno de estos factores es determinante, y no es necesario que concurran todos; si varias entidades se pueden o no considerar un solo patrono depende de un análisis de todas las

que: "The theory underlying this concept is that where several nominally separate businesses integrate their operations, thereby combining their resources and gaining leverage over their employees, they should be treated as a single employer for purposes of enforcing duties imposed by the National Labor Relations Act."

El hecho de que estas expresiones aparezcan en la opinión disidente del caso en nada disminuyen su valor, pues tanto la opinión mayoritaria como la disidente entendieron que no se cumplían los criterios de la doctrina de un solo patrono. La diferencia fue que la opinión disidente entendió que al no cumplirse la doctrina de un solo patrono se debió investigar si aplicaba la de descorrer el velo corporativo (álter ego) o la de patrono sucesor (*successorship*).

[8] En *Odriozola* v. *S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985), señalamos que bajo la Ley Federal contra el Discrimen en el Empleo, 29 U.S.C. sec. 621 y ss., equivalente a nuestra Ley Núm. 100 (29 L.P.R.A. sec. 146 y ss.), se utilizan estos mismos criterios para encontrar a dos o más patronos responsables solidariamente.

circunstancias del caso. Lo fundamental es determinar si existe un control general de los asuntos críticos en los niveles de política laboral de las compañías. *Penntech Papers, Inc.* v. *N.L.R.B.*, supra, pág. 25.

■ La doctrina de un solo patrono se usa generalmente cuando se trata de compañías que coexisten, mientras que las doctrinas de descorrer el velo corporativo (álter ego) y del patrono sucesor (*successorship*) se utilizan cuando una compañía sustituye a otra. En lo que respecta a la doctrina de descorrer el velo corporativo (álter ego) la determinación es subjetiva, se investigan los propósitos de las compañías al realizar su restructuración; bajo la doctrina de un solo patrono la determinación es objetiva, se examinan los cuatro criterios antes mencionados para determinar si existe el control general de los asuntos críticos en los niveles de política laboral necesario. Nota, *op. cit.*, págs. 638, 641–642.

Del récord surge que en el caso de autos están presentes los cuatro criterios antes mencionados:

*Operaciones interrelacionadas*

■ La Corporación fue creada como parte de un esquema general abarcador para facilitar la operación del complejo de condominios Playa Azul I, II y III. Cada condominio individual sería administrado por una asociación de condóminos a tenor con la Ley de Propiedad Horizontal. Para coordinar la administración de las facilidades recreativas comunes a los tres edificios se creó la Corporación en cuya administración participarían todos los condóminos a través de los miembros de las Juntas de Directores de las Asociaciones que fueran electos para formar parte de la Junta de Directores de la Corporación. La finalidad, tanto de las Asociaciones como de la Corporación es lograr la ordenada administración del complejo en beneficio de todos los condóminos. Para lograr este propósito, la Corporación y las distintas Asociaciones comparten no sólo el personal administrativo y directivo según

rota su presidencia, sino también las facilidades físicas y materiales de oficina. El hecho de que las Asociaciones y la Corporación mantienen nóminas y cuentas bancarias separadas y celebran reuniones de juntas de directores distintas, no desvirtúa la existencia de las operaciones interrelacionadas. *Penntech Papers, Inc.* v. *N.L.R.B.*, supra, pág. 25; Nota, *op. cit.*, pág. 632.

*Control centralizado de las relaciones laborales, y administración común*

El esquema organizativo de estas entidades está precisamente diseñado para lograr, a través de la Corporación, el control centralizado de la administración de las facilidades recreativas comunes, incluyendo la centralización de la política laboral. Esto lo logran compartiendo los mismos oficiales y directores lo que en sí es suficiente para establecer la administración común y el control centralizado de las relaciones laborales. *Penntech Papers, Inc.* v. *N.L.R.B.*, supra, pág. 25; *N.L.R.B.* v. *Don Burguess Const. Corp.*, supra, pág. 385. El hecho de que cada Asociación tiene convenios colectivos con fechas de vigencia independientes, no afecta esta conclusión.

*Control financiero o propiedad común*

■ Los fondos de la Corporación provienen directamente de las Asociaciones. El hecho de que ésta y las Asociaciones tengan cuentas bancarias separadas en nada afecta el control financiero centralizado; ya que estos fondos serán administrados por una junta de directores compuesta por miembros de las Juntas de Directores de las tres Asociaciones.

Aplicados estos criterios al caso de autos concluimos que existe el control general de los asuntos críticos en los niveles de política laboral necesario para que las cuatro querelladas puedan ser consideradas un solo patrono a los fines de la Ley de Relaciones del Trabajo, independientemente de que el pro-

pósito inicial de la creación de este complejo organizativo no haya sido promovido por hostilidad contra la Unión o los derechos gremiales de los empleados.

## III

■ Convenimos con la Junta en que efectivamente las querelladas incurrieron en una práctica ilícita de trabajo según lo dispuesto en el Art. 8(1)(a) y (1)(c).([9]) El derecho de los obreros a organizarse y a negociar colectivamente en Puerto Rico tiene raíces y abolengo constitucional. Art. II, Sec. 17 de la Constitución del Estado Libre Asociado de Puerto Rico. De ahí que las disposiciones sobre la aplicación —incluyendo las exenciones— de leyes sobre relaciones del trabajo deben ser interpretadas liberalmente en favor de la protección y fomento de estos derechos, teniendo siempre presente que estas leyes son parte de un esquema amplio y abarcador encaminado a implantar la directriz constitucional. *Junta Rel. Trabajo* v. *Club Deportivo*, 84 D.P.R. 515, 519 (1962).

---

[9]Las Secs. (1)(a) y (1)(c) del Art. 8 (29 L.P.R.A. sec. 69(1)(a) y (1)(c)), disponen:

"(1) Será práctica ilícita de trabajo el que un patrono, actuando individualmente o concertadamente con otros:

"(a) Intervenga, restrinja, ejerza coerción o intente intervenir, restringir o ejercer coerción con sus empleados en el ejercicio de los derechos garantizados por la sec. 65 de este título.

"(c) Estimule, desaliente o intente estimular o desalentar la matrícula de cualquier organización obrera mediante discriminación al emplear, despedir o en relación con la tenencia de empleo u otros términos o condiciones de empleo, incluyendo un paro patronal; Disponiéndose, que nada de lo aquí contenido prohíbe a un patrono hacer un convenio de afiliación total o de mantenimiento de matrícula con cualquier organización obrera no establecida, mantenida o ayudada por acción alguna definida en este subcapítulo como práctica ilícita de trabajo, si dicha organización obrera representa una mayoría de los empleados en una unidad apropiada con facultad para la contratación colectiva."

■ A tono con este enfoque encontramos que las actuaciones de las querelladas reflejan un patrón de conducta encaminado a desalentar y restringir el ejercicio de los derechos gremiales del obrero. Tanto el Presidente de la Unión como el señor Castillo reiteradamente les habían manifestado a los miembros de las Juntas de Directores de las Asociaciones y de la Junta de la Corporación el interés que tenían en que éste perteneciera a la Unión. Éstos en todo momento desalentaron esta iniciativa alegando que por ser el obrero empleado de la Corporación, que no tenía unión, no podía accederse a lo solicitado. Aun así, tanto era el interés del obrero que éste, por su cuenta, decidió pagar las cuotas de la Unión. De otra parte, apenas un mes después que el señor Sánchez asumió la presidencia y administración de la Corporación surgió el problema relacionado con la rebaja de salario. El Presidente de la Unión intervino directamente con el señor Sánchez en favor del obrero y la gestión culminó con el despido de éste último. No cabe duda que tanto la conducta de las Asociaciones como de la Corporación fue desalentar al señor Castillo en su intento de ejercer su derecho a afiliarse; primero negándose a reconocer ese derecho y finalmente despidiéndolo cuando a través del Presidente de la Unión hizo gestiones en favor de sus reclamaciones salariales. Las actuaciones de las querelladas con posterioridad al despido, tomadas en conjunto con las palabras de la entonces asesora legal ([10]) del señor Sánchez al encontrarse con el señor Castillo luego de su despido, claramente confirman y corroboran que lo que produjo el despido fue el intento de las querelladas de desalentar el ejercicio de los derechos gremiales por parte del obrero.

---

([10]) La asesora legal de la Corporación le expresó al señor Castillo que de no haber actuado en la forma descrita —al acudir a la unión para quejarse de la reducción de salario, y luego del despido— se le hubiera ofrecido una oportunidad como guardia en el Condominio III, ya que existía una vacante.

## IV

Resuelto que las querelladas cumplen los criterios de la doctrina de un solo patrono, para fines de la Ley de Relaciones del Trabajo de Puerto Rico, según explicado en la parte II de esta opinión, y por haber determinado que se cometió la práctica ilícita imputada, *se dictará sentencia en la que se pondrá en vigor la decisión y orden de la Junta de Relaciones del Trabajo de Puerto Rico.* ([11])

El Juez Asociado Señor Hernández Denton concurre en el resultado sin opinión escrita.

---

([11]) Sólo hemos resuelto que el despido del señor Castillo constituyó práctica ilícita para fines de la Ley de Relaciones del Trabajo de Puerto Rico, al desalentar y discriminar contra éste por intentar ejercer sus derechos gremiales. No nos manifestamos, por no estar ante nuestra consideración, sobre la existencia de unidad apropiada, si el obrero era miembro *bona fide* de la unión o si se siguió el procedimiento adecuado para que el obrero perteneciera a ésta.

Al ponerse en vigor esta orden, las cuatro querelladas, consideradas un solo patrono, pagarán al señor Castillo el salario dejado de devengar según lo acordado en el contrato original entre éste y la corporación.