# 2002 DTA 126

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL I DE SAN JUAN, PANEL IV**

CCPR SERVICES, INC. (H/N/C *"CINGULAR WIRELESS"*) (ANTES *"CELLULAR ONE"*)
Apelada

v.

JORGE RUIZ SOSA
Apelante

Núm. KLAN-2002-00012

San Juan, Puerto Rico, a 14 de agosto de 2002

Panel integrado por su Presidente, el Juez Gierbolini,
y los Jueces Cordero y Rodríguez Muñiz

Rodríguez Muñiz, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Jorge Ruiz Sosa (en adelante, el apelante), presentó recurso de apelación el 3 de enero de 2002. Solicitó la revisión de la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, el TPI), el 3 de diciembre de 2001 y archivada en autos el 4 del mismo mes y año.

A continuación exponemos brevemente el trasfondo fáctico y procesal del caso.

### I

El 14 de febrero de 1995, el apelante recibió una carta de la compañía CCPR Paging, Inc. (en adelante, CCPR Paging), mediante la cual se le ofreció una oportunidad de empleo en el Departamento de Contabilidad y Finanzas. **Sentencia Parcial** de 3 de diciembre de 2001, a la pág. 273 del apéndice de la apelación. La posición ofrecida fue como "*Staff Accountant*" y su primer día de trabajo sería el 1ro de marzo de 1995. *Id.* La carta de ofrecimiento de empleo indicaba expresamente que el apelante estaría a cargo de "*crear y documentar procedimientos para lograr controles internos efectivos y la distribución de gastos de CCPR Services, Inc. (D/B/A Cellular One).*" **Carta** de 14 de febrero de 1994, *Id.* a la pág. 1 (traducción nuestra). ██

La carta informaba la compensación a recibirse, la existencia de un bono de productividad, y otros beneficios como el plan de seguro de vida y salud de CCPR Services, Inc. (en adelante, CCPR Services). *Id.* Finalmente, la oferta de empleo advertía que a todos los asociados se les requería firmar un acuerdo de no competencia. *Id.* a la pág. 2.

El 1ro de marzo de 1995, el apelante firmó un documento titulado "*Employment and Non-Disclosure Agreement*", en el cual él era descrito como el empleado y CCPR Services, como el empleador. *Id.* a las págs. 3-7.

De acuerdo a la sentencia apelada, con la firma de ese acuerdo, el apelante comenzó a prestar servicios como "*Staff Accountant*" para CCPR Paging y, además, le fue entregado un manual de procedimientos de la compañía Cellular One. *Id.* a la pág. 274.

Según determinó el TPI, CCPR Services es la compañía matriz del grupo Cellular One y CCPR Paging es una de sus subsidiarias. CCPR Services posee una licencia para el negocio de comunicación celular y CCPR Paging una para la operación de buscadores personales o "*beepers*". *Id.* De acuerdo con la sentencia apelada, estas compañías trabajan en equipo, comparten la misma oficina de recursos humanos y ofrecen beneficios como plan médico y compra de acciones. Además, todos los contratos y negociaciones las hace CCPR Services como compañía matriz. Sin embargo, el TPI aclaró que esas compañías son entidades corporativas distintas, con estados financieros y gastos de nómina separados, y los empleados de una no hacían trabajo para la otra. *Id.*

El contrato pactado entre CCPR Services y el apelante contenía una cláusula denominada convenio

restrictivo ("*Restrictive Covenant*"). Por el término de un año, a partir del momento en que el empleado cesara de trabajar para CCPR Services, esta cláusula prohibía que el empleado realizara una serie de actos señalados en la misma. *Employment and Non-Disclosure Agreement, Id.* a la pág. 3.

La cláusula lee como sigue:

"...*Employee will not for himself/herself or any other person or entity, directly or indirectly, by stock or other ownership, investment, management, consultation, employment or otherwise, or in any relationship whatsoever, within the Commonwealth of Puerto Rico:*

*Solicit[,] divert, or take away or attempt to solicit, divert or take away any of the Employer's business, customers or patronage; and/or attempt to seek or cause any of the employer's customers to refrain from patronizing the Employer, as to those customers who were personally obtained by the Employee during his tenure with the Employer and who continued being active clients in the preceding twelve months prior to his/ her termination of employment;*

*Solicit, divert, or take away or attempt to solicit, divert or take away any of the Employer's business, customers or patronage; and/or attempt to seek or cause any of the Employer's customers to refrain from patronizing the Employer as to those customers or business to which the employee had in any manner or form a direct or indirect access during his/her employment, including but not limited to information regarding customer credit history, customer payment history, marketing strategy, credit and collection, customer care and any other service that may be provided by the Employer.*

*Engage in any business which competes, directly or indirectly, with the Employer or its affiliates.*

*Knowingly engage or attempt to employee [sic] or engage in any capacity any person in the employ of the Employer or it's affiliates at the time of such termination or at any time during the period after such termination.*

## 5. NON DISCLOSURE OF INFORMATION

*Employee recognizes and acknowledges and covenants and agrees with the Employer that any and all customer and employee list, trade names and trade marks, plans, methods, forms, practices, techniques, manuals and service utilized by the employer, as they may exist from time to time, are a valuable, special, and unique asset of the Employer's business. Employee will not, during or after the term of his employment, disclose any of the aforesaid to any person, corporation, partnership, association, or entity for any reason or purpose whatsoever or use of any of the aforesaid directly or indirectly in any business or enterprise other that [sic] the business of the Employer.*

. . . . .

## 7. INJUNCTION

*In the event of a breach or threatened breach by Employee of the provisions of this Agreement, the Employer shall be entitled to an injunction restraining Employee from such a breach or [sic] threatened breach, including the recovery of damages from the Employee.*"

El 30 de julio de 2001, el apelante anunció mediante una carta al Sr. José J. Dávila, Vicepresidente de Finanzas de Cingular Wireless Network, ■ su determinación de renunciar, efectivo el 10 de agosto de 2001. Indicó que habría de irse a trabajar por cuenta propia. No obstante, desde el 24 de julio de 2001, había recibido

una confirmación de oferta de empleo de Centennial de Puerto Rico, Cable T.V. Corp., para ocupar una posición de *"Finance Manager"*. Al momento de producirse la renuncia, el apelante ocupaba el puesto de *"Senior Financial Analyst"* en CCPR Services. *Sentencia, Id.* a la pág. 276.

El 2 de agosto de 2001, el apelante firmó un contrato de empleo con Centennial de Puerto Rico Operations Corp., compañía que posee una licencia para operar en el negocio de celulares. Este contrato fue firmado mientras el apelante aún era empleado de CCPR Services. *Id.* a la pág. 277.

Ante esa situación, el 5 de septiembre de 2001, CCPR Services entabló una demanda ante el TPI. Solicitó a dicho tribunal que dictara órdenes de entredicho provisional, *injunction* preliminar y permanente en contra del apelante. Justificó dicha petición aduciendo que el apelante había comenzado a trabajar con una compañía competidora y que su conducta constituia una violación al acuerdo de no competencia y de no divulgación que había firmado. *Demanda, Id.* a las págs. 37-40. El apelante presentó su contestación el 18 de septiembre de 2001.

Luego de varios incidente procesales, el 15 de octubre de 2001, el apelante sometió una moción solicitando que fuera dictada sentencia sumaria. CCPR Services presentó su oposición el 17 de octubre de 2001.

Así las cosas, el 18 de octubre de 2001, el TPI celebró una vista. Según surge de la minuta, las partes estuvieron de acuerdo en que los asuntos de *injunction* preliminar y permanente fueran consolidados, por lo que el Tribunal procedió a celebrar una vista para escuchar la prueba en relación a los remedios solicitados. *Minuta, Id.* a las págs. 252-253.

De acuerdo a la minuta, una vez concluida la presentación de la prueba, el caso quedó sometido ante la consideración del TPI. *Id.* a la pág. 256. Posteriormente, el 3 de diciembre de 2001, el TPI dictó sentencia parcial, mediante la cual declaró ha lugar la demanda incoada por CCPR Services. Intimó el TPI que la cláusula de no competencia contenida en el contrato de empleo del apelante era válida y que la misma había sido violada, por lo que emitió una orden de *injunction* permanente prohibiendo al apelante trabajar con Centennial durante la vigencia del acuerdo suscrito entre las partes. *Sentencia, Id.* a la pág. 286.

Inconforme con la determinación del TPI, el apelante acude ante nos y señala los siguientes errores:

*"i. Incidió el tribunal de instancia al aplicar la doctrina laboral de "un sólo patrono", precisamente diseñada para proteger al trabajador puertorriqueño, a una controversia contractual sobre cláusulas de no competencia suscrita con una entidad corporativa distinta a la que en efecto contrató al empleado.*

*ii. Incidió el tribunal de instancia al determinar la validez de la cláusula de no competencia, toda vez que ésta no cumple con los requisitos jurisprudenciales establecidos en Arthur Young v. Virgilio Vega III.*

*iii. Incidió el tribunal de instancia al proveer el remedio interdictal sin que se hubieran cumplido los requisitos para concederlo y a base de una alegación de daños especulativa. Además, el propio cuadro fáctico donde se desenvuelve esta controversia ha convertido el injunction en académico.*

*iv. Incidió el tribunal de instancia al celebrar la vista en los méritos sin dirimir la solicitud y oposición a la sentencia sumaria que obraba en autos, máxime cuando el propio tribunal creó la expectativa de celebrar una vista a dichos efectos."*

Por las razones que se exponen a continuación, se confirma la sentencia apelada.

## II

En su escrito de apelación, el apelante argumenta que, aun presumiendo que la cláusula de no competencia en este caso sea válida, ésta no le era aplicable debido a que él no la suscribió con CCPR Paging, corporación para la que comenzó trabajando, sino con la compañía demandante, CCPR Services. El apelante sostiene que la compañía demandante no era su verdadero patrono, por lo cual ésta no está facultada para poner en vigor el acuerdo.

El TPI determinó, por su parte, que dichas compañías debían ser consideradas un sólo patrono. El apelante cuestiona dicha determinación, la cual especificó que con respecto a asuntos de personal, tanto CCPR Paging como CCPR Services se consideraban un mismo patrono. El TPI, en apoyo de esa determinación, citó la doctrina de *"un sólo patrono"*. El apelante sostiene que dicha doctrina es inaplicable al caso de autos, ya que la misma ha sido elaborada en el ámbito laboral para proteger a los empleados, y la misma no debe utilizarse en controversias de interpretación de contratos.

De acuerdo a las determinaciones de hechos realizadas por el TPI, las cuales no son cuestionadas por el apelante, CCPR Services es la compañía matriz de varias otras corporaciones subsidiarias, ▮ entre las cuales se encuentra CCPR Paging. *Sentencia Parcial*, a la pág. 278 del apéndice de la apelación. Según determinó el TPI, estas dos corporaciones trabajan en equipo, comparten oficinas de recursos humanos y ofrecen beneficios a los empleados. Estos recursos, según revelan los documentos que constan en el expediente del caso, son ofrecidos por CCPR Services. Por ejemplo, el plan médico, plan de compra de acciones para empleados y el plan de ahorros y retiro. **Véase** a las págs. 1, 146, 184 del apéndice de la apelación. Indicó también el TPI que CCPR Services, como compañía matriz, realiza todas las negociaciones y contratos. *Id.* a la pág. 274. CCPR Services, según expuso el TPI, emitió cheques de pago de salario del apelante. Dichos pagos, conforme surge del expediente, inclusive fueron emitidos durante los primeros meses del apelante haber sido contratado, época en que prestaba servicios para CCPR Paging (15 de marzo, 31 de marzo, 15 de mayo y 31 de mayo de 1995). *Id.* a la pág. 157.

De otra parte, la carta recibida por el apelante con el timbre de CCPR Paging, ofrecía a éste la oportunidad de trabajar con CCPR Paging; sin embargo, advertía que éste realizaría trabajos para CCPR Services. *Id.* a la pág. 1. Finalmente, el contrato de empleo fue pactado entre el apelante y CCPR Services, y éste expresamente indicaba que su contenido reunía todos los acuerdos entre las partes y que el mismo no podía ser alterado, a no ser que fuera por escrito. *Id.* a la pág. 6.

De lo anterior se puede concluir que el patrono del apelante lo era CCPR Services, quien pagaba su salario y podía transferirlo a sus diferentes subsidiarias o departamentos. De acuerdo a los documentos que obran en el expediente, el apelante comenzó trabajando en CCPR Paging, y entre 1998 a 1999, fue promovido a la división de finanzas de CCPR Services. **Véanse** a las págs. 223-232; **véanse, además**, *Id.* a las págs. 275-276. Finalmente, el apelante, al someter su renuncia, se encontraba trabajando en dicha división para Cingular Wirelesss, el nuevo nombre comercial de CCPR Services. *Id.* a las págs. 34, 276.

De los hechos anteriormente relatados, no tenemos dudas con respecto a que el apelante en todo momento fue empleado de CCPR Services, por lo que dicha entidad estaba facultada para hacer valer los términos del contrato de no competencia que pactó con el apelante. Por lo tanto, el error señalado no fue cometido.

En la sentencia apelada, el TPI llegó a idéntica conclusión al aplicar la doctrina de un sólo patrono. Según expuso nuestro Tribunal Supremo en *J.R.T. v. Asoc. C. Playa Azul I,* 117 D.P.R. 20 (1986), esta doctrina aplica cuando dos o más patronos cumplen los siguientes criterios: (1) operaciones interrelacionadas; (2) control centralizado de las relaciones laborales; (3) administración común; y (4) propiedad común. Ninguno de estos factores es determinante y no es necesario que concurran todos. Si varias entidades se pueden o no considerar un sólo patrono depende del análisis de todas las circunstancias del caso. Lo fundamental es determinar si existe

un control general de los asuntos críticos en los niveles de política laboral de las compañías. *Id.* a la pág. 30. Esta doctrina se usa generalmente cuando se trata de compañías que coexisten.

No hay duda, de acuerdo a los hechos, de que en este caso se cumplen los requisitos para la aplicación de la doctrina de un sólo patrono.

## III

El apelante alega dos razones para sostener que erró el TPI al determinar que la cláusula de no competencia en este caso no era válida. En primer lugar, que no existió una contraprestación de parte de CCPR Services para la firma del acuerdo; y en segundo lugar, porque la misma era irrazonable en cuanto a su limitación geográfica.

Las condiciones para la validez de las cláusulas de no competencia es asunto que fue tratado por el Tribunal Supremo de Puerto Rico en el caso de *Arthur Young & Co. v. Vega III*, 136 D.P.R. 157 (1994). En dicho caso se establecieron los siguientes requisitos para determinar si un acuerdo de este tipo es válido:

*"1) El patrono debe tener un interés legítimo en el acuerdo; es decir, que de no recibir la protección de una cláusula de no competencia, su negocio se vería sustancialmente afectado. Id. a la pág. 175. En cuanto a este factor, hay que considerar la posición del empleado en la empresa, de modo que se pueda determinar si éste está en posición de competir con su patrono en el futuro. Id.*

*2) El alcance de la prohibición debe corresponder con el interés del patrono, en cuanto a objeto, término, lugar de restricción o clientes afectados. Id. También, el objeto de la prohibición se debe limitar a actividades similares a las efectuadas por el patrono. Id. Por otro lado, el término de no competencia no debe exceder de doce (12) meses. Id. Con respecto al alcance de la prohibición, el acuerdo debe especificar los "límites geográficos o los clientes afectados." Id. a las págs. 175-176.*

*Si la prohibición está expresada en cuanto al área geográfica, "ésta debe limitarse a la estrictamente necesaria para evitar la competencia real entre el patrono y el empleado." Id. Si la prohibición se refiere a los clientes, la cláusula deberá circunscribirse a aquéllos "que el empleado atendió personalmente durante un período razonable de tiempo antes de renunciar o en un período inmediatamente anterior a la renuncia ....". Id. Esta prohibiciones serían evaluadas "teniendo en mente la naturaleza de la industria involucrada y el posible interés publico relacionado." Id.*

*3) El patrono debe ofrecer una contraprestación a cambio de la firma del acuerdo de no competir por parte del empleado. En el caso de empleados a ser reclutados por la empresa, la obtención del empleo mismo es suficiente contraprestación. Id.*

*4) El acuerdo deberá cumplir con los elementos esenciales para su validez: consentimiento objeto y causa;*

*5) y el mismo deberá constar por escrito. Id."*

El apelante argumenta que el acuerdo de no competencia no es válido debido a que la compañía demandante nunca le otorgó una contraprestación a cambio de su sumisión al mismo. Como ha sido discutido, CCPR Services era el patrono del apelante. De acuerdo a la doctrina prevaleciente, cuando se trata de empleados ha ser reclutados, la obtención del empleo es suficiente contraprestación para validar el acuerdo. Esa fue la situación en este caso. La carta de oferta de empleo sometida al apelante explicaba los beneficios a ser recibidos e indicaba la necesidad de firmar el acuerdo de no competencia, el cual posteriormente fue suscrito por el apelante y CCPR Services.

En cuanto a la limitación del área geográfica, el TPI señaló que no resultaba irrazonable, tomando en

consideración la industria involucrada, que la restricción se extendiera a todo Puerto Rico, debido a que *"el interés de competencia y la información que se pretende proteger es la misma en cualquier punto de nuestra jurisdicción territorial por que (sic) podría ser utilizada dondequiera. Insistimos en lo particular del negocio de las telecomunicaciones que precisamente persigue el tener presencia y vigencia constante sin barreras físicas."* **Véase** a la pág. 285 del apéndice de la apelación. De acuerdo a lo que concluyó el TPI en su sentencia, el apelante puso en conocimiento a Centennial de sus conocimientos adquiridos en el área de las comunicaciones *"como uno de sus atractivos para ocupar la nueva posición." Id.* a la pág. 283.

Coincidimos con lo dictaminado por el TPI. En el mercado de las telecomunicaciones, las compañías que operan en Puerto Rico hacen sus negocios a través de toda la Isla y compiten directamente las unas con las otras, por lo cual no resulta irrazonable que la limitación se extienda a todo Puerto Rico. De otra parte, el apelante, en su escrito de apelación, nada aduce para demostrar que la limitación es irrazonable. Este se limita a citar dos casos de este Tribunal, con hechos distintos a los de este caso y sin discutir los mismos.

Los errores señalados no fueron cometidos.

## IV

Como tercer error, el apelante argumenta que en el caso de autos no estaban presentes los requisitos legales para la concesión del remedio de *injunction* permanente. En específico, aduce que en el caso de autos no existe un daño palpable que pudiera ser evaluado porque su trabajo con Centennial sería en Cable TV y no en celulares. Indica, también, que no existen daños irreparables debido a que no existe incumplimiento de contrato alguno, ya que el contrato firmado fue con una entidad que no fue su patrono, y por esa misma razón, aduce que CCPR Services no tiene probabilidad de prevalecer.

El Tribunal Supremo ha establecido los criterios que se deben tomar en cuenta al decidir si se concede o no un remedio provisional de *injunction*; éstos son:

*"la naturaleza de los daños que pueden ocasionárseles a las partes de concederse o denegarse el injunction; su irreparabilidad o la existencia de un remedio adecuado en ley; la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo; la probabilidad de que la causa se torne en académica de no concederse el injunction y, sobre todo, el posible impacto sobre el interés público del remedio que se solicita."*

*P.R. Telephone Co. v. Tribunal Superior*, 103 D.P.R. 200, 202 (1975); *Municipio de Ponce v. Rosselló*, 136 D. P.R. 776 (1994).

En cuanto al remedio de *injunction* permanente, éste requiere la celebración de una vista y *"la consideración de la mayor parte de estos criterios." Mun. de Loíza v. Sucesiones de Marcial Suárez,* **2001 J.T. S. 87**, 1377-78, Op. de 11 de junio de 2001.

Por su parte, la Ley de *Injunction* dispone que puede concederse un *injunction* en los siguientes casos:

*"(1) Cuando resultare de la petición que el peticionario tiene derecho al remedio solicitado, y dicho remedio, o parte del mismo, consistiere en impedir la comisión o continuación del acto denunciado, bien por un período de tiempo limitado, o perpetuamente.*

*(2) Cuando de la petición o declaración jurada resultare que la comisión o continuación de algún acto, durante el litigio, habrá de causar pérdidas o daños de consideración o irreparables a alguna de las partes.*

*(3) Cuando, durante el litigio, resultare que una de las partes está cometiendo, o amenaza cometer, o que*

*se dispone a cometer, o a procurar o permitir que se cometa, algún acto contrario a los derechos de otra de las partes, con respecto al asunto en litigio y tendente a hacer que sea ineficaz la sentencia.*

*(4) Cuando una compensación pecuniaria no habría de proporcionar adecuado remedio.*

*(5) Cuando fuere sumamente difícil precisar la cuantía de la compensación que habría de proporcionar remedio adecuado.*

*(6) Cuando la restricción fuere necesaria para impedir una multiplicidad de procedimientos judiciales."*

32 L.P.R.A. sec. 3523.

En la argumentación del error señalado, el apelante pierde de vista que lo exigido por el ordenamiento para la concesión del remedio de *injunction* no es necesariamente la existencia de un daño, siendo suficiente la probabilidad de que éste pueda ocurrir. ■ De otra parte, hay que tomar en consideración que en el caso de autos, el TPI celebró la vista en su fondo con respecto a la violación de la cláusula de no competencia, determinó que ésta había sido infringida, y concedió un *injunction* permanente.

Mediante la sentencia apelada, el TPI determinó, además, que el apelante había comenzado a trabajar para una empresa que compite directamente con su antiguo patrono. Indicó también el TPI que el apelante, durante sus años de servicio en CCPR Services, adquirió información sensitiva relativa a los negocios de ésta. Información relacionada a estructuras de costos, determinaciones de precios de los productos ofrecidos para competir, además de que se benefició del entrenamiento ofrecido por su patrono en el área de la industria de la comunicación. **Sentencia,** a la pág. 276 del apéndice de la apelación. Por ello, el TPI concluyó que existía la posibilidad de que éste infringiera los acuerdos que pactó con CCPR Services en el sentido de que no compartiría dicha información con empresas competidoras.

De otra parte, el TPI determinó que el nuevo patrono del apelante era Centennial Operations Corp., una compañía que posee una licencia para operar en el negocio de celulares, y que con ésta pactó un contrato de no competencia que no limitaba el que el apelante pudiera trabajar en las filiales dedicadas a los celulares o al negocio de Cable TV. *Id.* a la pág. 277-78. También destacó el TPI que Centennial compite directamente con CCPR Services en el negocio de celulares. *Id.* a las págs. 283-84. Basado en esa información, el TPI determinó que el apelante, al firmar un contrato de empleo con Centennial, había violado la cláusula de no competencia. Finalmente concluyó que el remedio de *injunction* procedía, debido a que la cláusula de no competencia en este caso tiene como objetivo evitar que un empleado con información sensitiva en el área de telecomunicaciones comparta la misma con un competidor de su antiguo patrono. *Id.* a la pág. 284.

Tomando en consideración lo anterior, el error señalado no fue cometido. El remedio de *injunction* es el mecanismo disponible para poner en vigor las restricciones impuestas por la cláusula de no competencia; CCPR Services prevaleció en los méritos de la controversia relativa a la violación de dicha cláusula y estableció la probabilidad de sufrir un daño irreparable, dado que el apelante posee información sensitiva relacionada a su manera de manejar el negocio de celulares, la cual adquirió mientras trabajaba para ella y se benefició de los entrenamientos recibidos.

## V

Como último error, el apelante señala que erró el TPI al proceder a celebrar la vista de *injunction* en los méritos obviando resolver la moción solicitando sentencia sumaria que éste había sometido. Indica que el TPI debió atender dicha moción, debido a que esa es la manera más rápida de descongestionar el calendario del tribunal. Señala, además, que el TPI creó la expectativa de que ese era el trámite procesal que sería seguido.

El apelante argumenta que se opuso a que la vista de *injunction* fuera celebrada y solicitó que fuera atendida la solicitud de sentencia sumaria. No obstante, el apelante no nos ha puesto en posición de conocer qué razones adujo para que el caso no se viera en los méritos, ni en qué manera se afectó la disposición de su caso por esa circunstancia. De la minuta de la vista celebrada el 18 de octubre de 2001, surge que el apelante contrainterrogó a los testigos presentados por CCPR Services, declaró a su favor, y sometió evidencia de tipo documental.

Por otro lado, el TPI consignó en la sentencia apelada que las partes manifestaron estar preparadas para la celebración de la vista de *injunction* y que ésta permitiría la disposición más rápida de la acción interpuesta. **Sentencia**, a la pág. 272 del apéndice de la apelación.

Tomando en consideración lo anterior, el error señalado no fue cometido.

## VI

Por las razones antes expuestas, se confirma la sentencia apelada.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2002 DTA 126

**1.** *"You will be in charge of creating and documenting procedures to achieve effective internal controls and the allocations of expenses from CCPR Services, Inc. (D/B/A Cellular One)."*

**2.** Cingular Wireless Network es el nuevo nombre de la gestión de negocios que CCPR Services hace en Puerto Rico.

**3.** En el ámbito corporativo, una corporación subsidiaria es una corporación de la cual otra posee la mayoría de sus acciones, y por lo tanto, tiene el control de la misma. *Black's Law Dictionary* 1428 (6ta Ed 1990).

**4.** El recurso de *injunction* es un remedio para impedir la comisión o continuación de un acto que puede causar daños irreparables si no se impide. **Véase** 32 L.P.R.A. 3523 (1990); David Rivé Rivera, *Recursos Extraordinarios* 22, 35 (1996).