ANDRÉS BÁEZ CANCEL ET AL., demandantes y apelantes, *v.* SANTOS RIVERA PÉREZ ET AL., demandados y apelados.

*Número:* O-71-103    *Resuelto:* 7 de diciembre de 1972

*Elí Beléndez García* y *Salvador Acevedo Colón,* abogados de los apelantes; *Antonio Bauzá Torres,* abogado de los apelados.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

██  Es función ineludible de este Tribunal el dar vigencia a las garantías constitucionales establecidas en la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico para la protección de los derechos individuales. El presente caso reclama el ejercicio de esa función con respecto a la garantía constitucional contra discrímenes por motivo de ideas políticas. Sec. 1, Art. II de la Constitución del Estado Libre Asociado de Puerto Rico.

Se trata de un auto de *mandamus* instado por varios capataces del Municipio de Guaynabo para ordenarle al Alcalde la reinstalación en sus empleos y el pago de los salarios devengados hasta la fecha que fueran restituidos. Fundaron su petición en que la actuación del Alcalde dejándolos cesantes fue motivado por ideas políticas en violación de las garantías establecidas en la Sec. 1 del Art. II de la Constitución del Estado Libre Asociado. Se opuso el Alcalde al remedio solicitado aduciendo que los peticionarios, aquí recurrentes, no eran empleados permanentes sino irregulares, que él nunca se había negado a darles empleo y que ellos "sencillamente no se presentaron a trabajar a partir del 12 de enero de 1969." O sea, que los capataces habían abandonado sus puestos.

Las conclusiones de hecho del tribunal de instancia revelan lo siguiente:

Al tomar posesión del cargo de Alcalde del Municipio de Guaynabo, el recurrido, Honorable Santos Rivera Pérez, no utilizó más los servicios del Director de la Defensa Civil y de alrededor de treinta y tres capataces de las brigadas de mantenimiento y reparación de calles, aceras y caminos municipales. Tanto los capataces como el Director de la Defensa Civil pertenecían al Partido Popular Democrático y fueron sustituidos por personas afiliadas al Partido Nuevo Progresista. El tribunal rechazó la versión del Alcalde de que dichos capataces habían abandonado sus puestos y de que él nunca se había negado a darles empleo, concluyendo, por el contrario, que:

"3. El Alcalde demandado Hon. Santos Rivera Pérez fue electo por el Partido Nuevo Progresista a esa posición en las elecciones generales celebradas en noviembre de 1968. Tomó posesión de su cargo el 13 de enero de 1969. Una vez en el poder no utilizó más los servicios de los peticionarios a cargo de esas labores de conservación ya mencionadas y les hizo devolver las herramientas en su poder. No se les formularon cargos, ni se decretó formalmente cesantía alguna. Para los trabajos que ellos

realizaban se utilizó entonces a personas afiliadas al Partido Nuevo Progresista. Los peticionarios eran militantes del Partido Popular Democrático, algunos de ellos habiéndose significado en la lucha política reciente como líderes de ese partido en los distintos barrios o precintos."

██ No empece la anterior conclusión, el tribunal consideró innecesario formular una conclusión específica sobre los motivos políticos del despido por entender equivocadamente que la garantía constitucional contra discrímenes por razón de ideas políticas no les era aplicable a los apelantes.

Hemos examinado detenidamente el récord y es preciso consignar que la prueba desfilada sostiene ampliamente una conclusión al efecto de que los apelantes fueron despedidos por motivo de sus ideas políticas.

Así, Andrés Mojica O'Neill, uno de los capataces despedidos, relata su conversación con el Alcalde a raíz de éste tomar posesión. Fue a ver al Alcalde y "le dije 'yo soy empleado de 20 años aquí, de este Municipio y vine a recibir órdenes suyas a ver lo que me ordene, si continúo el trabajo que tengo empezado, o me va a trasladar a otro sitio' . . . y entonces me contestó, 'no importa el tiempo que sea, mucho o poco que trabaje en el Municipio, lo que importa es que recuerde que la situación, que la administración cambió,' y le dije: 'el mero hecho de haber cambiado la administración me libra del trabajo, no tengo oportunidad?', me dijo: 'no, lo que me interesa que recuerde la situación y recuerde que la administración cambió' y le dije: 'don Santos, recuerde que soy un padre de familia que no tengo otra fuente de ingreso que mi trabajo, que tengo un muchacho de escuela de alto grado y la cesantía me puede perjudicar' y me diga esa cuestión [*sic*] 'recuerde que la administración cambió, que la situación cambió.' " (T.E. pág. 13, vista celebrada 16 sept. 1969.)

Mojica fue sustituido por Sergio De Jesús, Presidente del Partido Nuevo en el pueblo. (Id.)

Pedro Bernabe se reportó a trabajar el martes 14 de enero de 1969, el día después de la toma de posesión y le preguntó al Alcalde "si iba a seguir trabajando, que hacían cuatro años que estaba trabajando de capataz del Municipio, y entonces él me dijo, 'muchacho hay como doscientos o trescientos ya y tú tienes que comprender que la Administración cambió y que eso lo necesitamos para los de la Palma'." (Id. pág. 23.)

Bernabe fue sustituido por Guillermo Morán, miembro del Partido Nuevo Progresista.

Agapito Fines García habló con el Alcalde el martes 14 de enero de 1969 y éste le dijo "que todos los capataces, por lo menos yo, estaban sustituidos por otro capataz, porque la Palma había ganado y esos puestos había que dársele a la Palma." (Id. pág. 53.)

Andrés Báez Cancel visitó al Alcalde el día 14 del enero. Declaró: "Le dije que yo le iba a pedir órdenes, si seguía continuando en mis labores en el barrio o me transfería a otro barrio, yo estaba dispuesto a seguir trabajando y él me dijo que no tenía trabajo, que comprendiéramos que el partido Popular había perdido y que los puestos que quedaban era de la Palma." (Id. pág. 129–130.) Nombraron en sustitución de él a su hermano Germán Báez Cancel, miembro del Partido Nuevo.

El Director de la Defensa Civil, Ebel Aquino Hernández, fue a su oficina a trabajar el día de la toma de posesión del Alcalde, y allí una persona le informó que habían nombrado a otro por él. Luego se encontró con el Alcalde "y entonces hablé con él, le pregunté qué pasaba que en mi oficina había otra persona por mí, y me contestó que como ellos habían ganado, ganado las elecciones, habían puesto otra persona." (T.E. págs. 44–45, vista de 16 de sept. de 1969.)

A pesar de este patente cuadro de discrimen, el tribunal de instancia desestimó la demanda por entender que los capataces eran empleados irregulares sin protección de per-

manencia bajo el Sistema de Mérito del Municipio. Determinó que la mencionada garantía constitucional no era de aplicación, expresando al respecto:

"Los peticionarios aducen como fundamento adicional en su caso las disposiciones constitucionales, Art. 2 Sec. 1ra. de la Constitución del Estado Libre Asociado de Puerto Rico, las disposiciones de la Ley Municipal 1960, supra, Art. 91, 92 y 93 y las disposiciones de la citada Ordenanza Municipal, donde se establece la protección respecto al discrimen por motivo de ideas políticas. (Sec. 44.) Estas disposiciones no resultan de aplicación a este caso, donde aparece que los peticionarios no tenían derecho a permanencia en el empleo o trabajo en el Servicio Municipal. Sostener que estos peticionarios deben ser repuestos en sus trabajos para el Municipio por esta razón, equivaldría a reconocer un derecho de permanencia, que según la Ley no tienen. Dada la situación de derecho aplicable a la relación de estos peticionarios con el Municipio de Guaynabo, este planteamiento resulta irrelevante e impertinente a sus casos particulares."

No estamos de acuerdo. La Sec. 1 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico prescribe en forma clara que "no podrá establecerse discrimen alguno por motivo de raza, color, . . . ideas políticas o religiosas." La proscripción del discrimen es clara y terminante. Su texto no permite distinción alguna. Quiere decir lo que dice. Que el Estado en ninguna de sus múltiples funciones o servicios puede discriminar contra un ciudadano por el mero hecho de ser éste negro, ateo, o por sus ideas políticas. Cualquier otra interpretación enervaría su eficacia. Fortalecerla y no enervarla es nuestro deber, como los principales custodios de la Constitución.

Limitar su aplicación, como hizo el tribunal de instancia, a aquellos empleados que tienen permanencia bajo el Sistema de Mérito del Municipio es forzar una distinción contraria a su verdadero espíritu y propósito. Tal interpretación dejaría huérfanos de protección, precisamente, a los más desvalidos.

Como es sabido, los empleados permanentes tienen la protección de la propia Ley Municipal que taxativamente prescribe que "ningún empleado municipal será nombrado, ascendido, degradado, o suspendido ni en ninguna forma se discriminará contra él, por razón de razas o de ideas políticas o religiosas." Art. 92 Ley Municipal, Núm. 142 de 22 de julio de 1960, 21 L.P.R.A. sec. 1552. [1] Tienen también estos empleados la protección del Sistema de Mérito del Municipio que requiere justa causa para el despido, formulación de cargos y vista. Ordenanza Núm. 29 serie 1966–1967 del Municipio de Guaynabo. Ninguna de estas disposiciones protectoras cubre a los empleados irregulares. Sería un contrasentido interpretar que la Constitución ampara al grupo de empleados que menos lo necesitan—los empleados permanentes—mientras deja desamparados a los que más necesitan de su protección.

El recurrido arguye que el hecho de que los anteriores incumbentes hubiesen pertenecido a un partido y que alguno de los actuales incumbentes fuesen de otro partido no implica de por sí discrimen político. El argumento hace caso omiso de la prueba, la cual reveló que todos los capataces cesantea-

---

[1] La Ley de Personal del Estado Libre Asociado, Ley Núm. 345 de 12 de mayo de 1947, 3 L.P.R.A. sec. 676, en su sec. 36 tiene una disposición similar para proteger a los empleados del gobierno estatal:

"(a) Ninguna persona recibirá nombramiento, ni será ascendida o degradada, ni destituida de puesto alguno en el Servicio por Oposición, ni en ninguna forma será favorecida, ni recibirá trato desigual para empleo en el Servicio por Oposición, por razones políticas, religiosas, o de raza.

"(b) Ninguna persona procurará ni intentará usar respaldo político en relación con ningún nombramiento para un puesto en el Servicio por Oposición.

"(c) Ninguna persona utilizará, directa o indirectamente su influencia o autoridad oficial para obtener nombramiento a favor de una persona para cualquier puesto en el Servicio por Oposición, ni para obtener a favor de la misma un aumento de sueldo o cualquier otro beneficio, con el propósito de influir en la votación o actividad política a favor de alguna persona, o con ningún otro propósito.

"(d) Ninguna persona electa para un cargo estadual será nombrada en un puesto del Servicio por Oposición durante el transcurso del término por el cual ha sido electa."

dos pertenecían al partido que había perdido las elecciones y fueron sustituidos por personas afiliadas al partido de la nueva administración.

■ No se adujo justificación alguna para dejar cesantes a los recurrentes. Se recordará que el tribunal no adoptó la versión del Alcalde al efecto de que los recurrentes habían abandonado sus puestos y de que él nunca se había negado a darles empleo. Estamos de acuerdo que si se hubiera aducido alguna justificación razonable la cesantía no hubiese implicado discrimen alguno. Pero cuando sin justificación razonable alguna se dejan cesantes a un grupo de trabajadores de clara identificación política-partidista e inmediatamente se le sustituye con otro grupo de diferente filiación partidista, como sucedió en el presente caso, se crea una fuerte presunción de discrimen. Más aun cuando estos hechos ocurren justamente al cambio de una administración municipal a otra de distinto partido.

■ Tampoco puede aceptarse el argumento de que el Alcalde tiene amplia discreción para emplear y despedir a los trabajadores irregulares. El hecho de que estas facultades sean discrecionales no puede justificar, excusar o condonar el discrimen. El ejercicio de discreción no puede servir de mampara al discrimen. De lo contrario, sería fácil evadir artificiosamente la prescripción constitucional.

■ Es cierto que no es necesario formular cargos a los empleados irregulares para despedirlos del empleo. La Ley Municipal no lo exige, ni tampoco lo requiere la ordenanza estableciendo el Sistema de Mérito, sin que por ello adolezcan de vicio constitucional alguno. La garantía constitucional no impide que el Alcalde deje cesante a un empleado irregular sin dar razón alguna. Inclusive por mero capricho. *Cf. Luce & Co.* v. *Junta de Relaciones del Trabajo*, 71 D.P.R. 360 (1950); *J.R.T.* v. *Bankers Club of P.R.*, 94 D.P.R. 600 (1967).

■ El capricho, sin embargo, no debe ser favorecido por la ley. Por eso si no hay un motivo racional que justifique el despido y se sustituye al empleado por otro de diferente afiliación política, que resulta ser la misma del Alcalde, se crea una presunción de discrimen que el Alcalde viene obligado a refutar. *Cf. Avery* v. *Georgia,* 345 U.S. 559; *Whitus* v. *Georgia,* 385 U.S. 545.

La larga tradición de discrímenes por motivo de ideas políticas en el empleo municipal—véase como ilustración *Bezares* v. *González, Alcalde,* 84 D.P.R. 468 (1962)—requiere que los tribunales escudriñen la prueba para asegurarse que verdaderamente no hay discrimen en la actuación de la autoridad nominadora.

En el presente caso, como ya vimos, la prueba demostró que los recurrentes fueron despedidos por motivo de sus creencias políticas.

El caso del apelante Ebel Aquino Hernández, Director Municipal de Defensa Civil, plantea una cuestión distinta a la de los demás apelantes. Aquino Hernández fue nombrado por el anterior Alcalde en virtud de las disposiciones de la Ley de Defensa Civil de Puerto Rico, Ley Núm. 183 del 1ro. de mayo de 1951, 25 L.P.R.A. secs. 130 y siguientes. Dicha ley creó la Oficina de Defensa Civil Estadual, adscrita a la Oficina del Gobernador, con el propósito de asegurar la protección del orden, la salud y bienestar general en caso de desastres causados por la naturaleza o por fuerzas enemigas. Se trata de un organismo público diseñado para atender situaciones de emergencia y a tales fines se le otorgan poderes adecuados. La ley promueve la eficacia de este organismo mediante la centralización de poderes en la persona del Gobernador de Puerto Rico. A éste compete la dirección general y el control de la Oficina de Defensa Civil Estadual y la de todos los municipios. A él se le confiere la facultad de asumir, cuando lo estime necesario o conveniente, el control directo de todas o parte de las operaciones y funciones de la defensa

civil. Art. 6 de la Ley de Defensa Civil, *supra*, 25 L.P.R.A. sec. 135.

Tal es la importancia del elemento de centralización en la estructura administrativa de la Defensa Civil, que aun cuando el Director Local de Defensa Civil es nombrado por el Alcalde con el consentimiento de la asamblea municipal, éste queda sujeto a la dirección y control del Gobernador. Más todavía, la ley confiere específicamente al Gobernador *"la facultad de hacer los cambios de personal que estime necesario, en cualquier organización local."* Art. 8, 25 L.P.R.A. sec. 137.[2]

Los desastres de cualquier índole—sean ya causados por la naturaleza o por fuerzas enemigas—generalmente crean desconcierto y trastornos en la vida de la comunidad. Producen un estado de emergencia que requiere acción rápida y coordinada. Tal acción se logra con mayor eficacia cuando la línea de autoridad es clara y centralizada. Es por eso que la Ley de Defensa Civil confiere todos los poderes al Gobernador, incluyendo el hacer los cambios de personal que estime necesario en cualquier organización local. El ejercicio de esta facultad por los alcaldes de los 76 municipios de Puerto Rico daría margen a conflictos de criterio que entorpecerían la acción rápida y coordinada en casos de graves emergencias dando al traste con los propósitos de la Ley de Defensa Civil.

---

[2] El Art. 8(b) en lo pertinente lee:

"(b) El alcalde de cada municipio y el Administrador de la Capital, todos de aquí en adelante denominados 'el Alcalde,' con el consentimiento de la asamblea municipal respectiva y del Consejo de Secretarios en el caso del Municipio de la Isla de Culebra, todos de aquí en adelante denominados 'la asamblea municipal', está autorizado a nombrar al director local de la defensa civil, quien será directamente responsable de la organización, administración y funcionamiento de la entidad local de defensa civil, sujeto a la dirección y control del Gobernador de Puerto Rico a quien se le confiere la facultad de hacer los cambios de personal que estime necesario, en cualquier organización local. La organización municipal de defensa civil ejercerá sus funciones dentro del límite jurisdiccional del municipio, y en adición, ejercerá aquellas funciones fuera del límite municipal que sean necesarias de acuerdo con lo establecido en las secs. 130 a 146 de este título, o cuando así lo requiera el Gobernador."

■ Como hemos visto, la facultad de hacer los cambios de personal corresponde al Gobernador de Puerto Rico y no a los alcaldes. En el caso de autos el Alcalde de Guaynabo hizo caso omiso de la disposición estatutaria al sustituir al apelante Ebel Aquino Hernández en el cargo de Director Municipal de Defensa Civil. Su actuación es ilegal y no tiene validez.

Se dictará sentencia *revocando la dictada por el tribunal de instancia.*

Los Jueces Asociados, Señores Martínez Muñoz y Martín, disienten y consignarán en voto separado su disenso.

—O—

Opinión disidente emitida por el Juez Asociado Señor Martínez Muñoz con la cual está conforme el Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 7 de diciembre de 1972

Concurro con la mayoría en que los empleados irregulares, no permanentes, del gobierno y de sus agencias y de los municipios están constitucionalmente protegidos en sus empleos contra el despido discriminatorio por razón de ideas políticas. La larga tradición de discrímenes. por motivo de ideas políticas en el empleo municipal, como se apunta en la opinión mayoritaria, requiere que los tribunales escudriñen la prueba para asegurarse que verdaderamente no ha habido discrimen en la actuación de la autoridad nominadora.

Con lo que no puedo estar de acuerdo, sin embargo, es con el resultado a que se llega en este caso. Sin el beneficio de haber oído los testigos ni observado su comportamiento, la mayoría se ha convertido hoy en tribunal de instancia y en juzgador de una controversia de hecho que ni los demandantes ni los demandados plantearon adecuadamente, ni el tribunal recurrido resolvió, a saber: los motivos políticos del alegado despido como cuestión de hecho.

Las alegaciones de los reclamantes presentaron la siguiente teoría: los demandantes (32 en total originalmente) eran *empleados permanentes* que fueron destituidos por razones políticas. La posición del recurrido siempre fue que los demandantes no eran empleados permanentes, sino *irregulares*, que abandonaron sus puestos y que fueron sustituidos por otros.

El juez sentenciador, en más de una ocasión, durante el juicio le expresó a las partes cuál era, según su criterio, el punto en controversia. El juez sentenciador sustentó el criterio, según aparece de las págs. 81–82 de la transcripción (pieza II), que si los empleados eran empleados *regulares* y si abandonaron el trabajo era necesario que se le formularan cargos a cada uno. El juez se expresó así, luego de haber declarado unos diez reclamantes:

"SEÑOR JUEZ: (dirigiéndose al abogado de los demandantes)

Yo creo francamente, compañero, yo creo que estamos perdiendo el tiempo, porque aquí esto es una repetición de lo mismo, la misma cosa. Técnicamente lo que tiene el Tribunal que resolver es si estos empleados, bajo estas circunstancias son personal protegido por las disposiciones del Artículo 93 de la Ley Municipal, si un puestos [*sic*] es regular de la irregularidad del trabajo que desempeña. Utilizaría, con lo que se ha estipulado, el acto de conferencia municipal, quiero decir, conferencia municipal no, sino la conferencia preliminar con exhibits que se han sometido. Han delineado también el hecho esencial del empleo de estos demandantes con el Municipio y la regularidad con la cual trabajan en el Municipio. No estoy seguro en relación con el jornal, porque el jornal no es. . . .

PARTE DEMANDANTE:

No sería problema, porque nosotros podemos estipular, además no es necesario.

SEÑOR JUEZ:

La cuestión es si estos empleados pidieron reposición si se reportaron al trabajo, abandonaron el trabajo. Yo lo considero esencial si un empleado regular, protegido por dicho Artículo 93, entonces la única reparación [*sic*] válida es mediante formula-

ción de cargos, si el empleado abandona su puesto el Alcalde tiene que formularle cargos y se señala una audiencia y se determina si abandonó a no, ésa sea la justa causa que señale. De modo que estas circunstancias no releva al Alcalde del o de la formulación de cargos si se trata de empleados cubiertos y protegidos por el Artículo 93 de la Ley Municipal y cubierto por la Ordenanza de Méritos.

Parte Demandada:

Eh. . . .

Señor Juez:

Estos relatos que están haciendo los testigos y luego la repregunta para impugnar lo que digamos en cuanto a si efectivamente vieron al Alcalde o no, si han estado presentes, no es nada material en el caso."

El juez a quo, en su sentencia, concluyó que los empleados reclamantes no eran empleados regulares y sí caían "[b]ajo la clasificación de personal irregular, excluidos del Servicio por Oposición" y que "[d]ada la situación de derecho aplicable a la relación de estos peticionarios con el Municipio de Guaynabo, este planteamiento (despido por razones políticas) resulta irrelevante e impertinente a sus casos particulares."

El juez no formuló conclusión de hecho específica sobre la motivación política alegada. Tampoco "rechazó", como se afirma en la opinión mayoritaria, la teoría y versión del demandado de que los demandantes no se presentaron a trabajar. De los treinta y dos reclamantes, cuatro desistieron y sólo diez prestaron testimonio. De los diez, tres dejaron de aportar testimonio en el cual apoyar la determinación de hecho, que ahora formula la mayoría del tribunal, de que fueron destituidos por motivaciones políticas. (¹)

Soy de opinión que corresponde a la sala sentenciadora, como tribunal de instancia, hacer aquellas determinaciones de hecho que por un concepto equivocado de la verdadera controversia (según ahora la vemos nosotros) consideró "irrelevante

---

(¹) Estos tres son Manuel Crespo Reyes (págs. 33–37); Carmelo Robles (págs. 48–52); y Ambrosio Rosado (págs. 64–73).

e impertinente a sus casos particulares." A esos fines, dejaría sin efecto la sentencia apelada y devolvería el caso a la Sala sentenciadora para que procediese en forma consistente con lo antes expuesto.