WILFREDO MORALES MORALES, demandante y peticionario, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, ETC., demandados y recurridos.

Número: CE-87-42          Resuelto: 23 de abril de 1990

94

*Ariel Marrero Otero*, abogado del peticionario; *Rafael Ortiz Carrión, Procurador General, Alberto Oscar Couret Torres* y *Lorenzo Vilanova Alfonso, Procuradores Generales Auxiliares*, abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Este recurso nos permite evaluar la constitucionalidad de la Sec. 308 del Reglamento Núm. 2882 del Programa de Asistencia Nutricional del Departamento de Servicios Sociales de 28 de junio de 1982 (en adelante Reglamento del P.A.N.) promulgado por dicho departamento para cumplir con la ley federal del Programa de Cupones de Alimentos. Al amparo de la legislación federal, se

requiere que en las determinaciones de elegibilidad financiera de familias con obreros en huelga se consideren los ingresos que recibían antes del paro laboral. Examinada esta restricción a la luz de la doctrina de las condiciones inconstitucionales, confirmamos la decisión del foro de instancia mediante la cual se deniega la revisión solicitada.

## I

En vista de la merma en su ingreso como consecuencia de su participación en una huelga decretada contra su patrono, el Sr. Wilfredo Morales Morales solicitó los beneficios del P.A.N., administrado por el Departamento de Servicios Sociales. Evaluada su solicitud, Servicios Sociales lo declaró inelegible porque los ingresos brutos mensuales de la unidad familiar excedían las cuantías permitidas por el programa. Al amparo de la Sec. 308 del Reglamento del P.A.N., *supra*, el citado departamento computó los ingresos que percibía el peticionario antes de la huelga y determinó que no era elegible.

Por su parte, la Junta de Apelaciones del Departamento de Servicios Sociales confirmó la acción tomada porque "[l]a Oficina de Servicios Sociales actuó correctamente al rechazar la solicitud por exceso de ingreso bruto, toda vez que los ingresos recibidos por miembros de la unidad familiar participantes por huelga antes de decretarse ésta se consideraron para determinar elegibilidad en el Programa de Asistencia Nutricional (en adelante P.A.N.). En el caso del apelante, su ingreso bruto mensual devengado antes de la huelga junto con el de su esposa asciende a $1,248, lo cual sobrepasa la cantidad máxima establecida por el programa de $775 para unidades familiares compuestas por cinco (5) miembros". Resolución de la Junta de Apelaciones de la Oficina de Servicios Sociales en el caso número 86-PAN-2571, *Exhibit* 3, pág. 2.

Incoado el recurso de revisión ante el Tribunal Superior, éste denegó la petición al sostener que "[e]l recurrente tendrá un derecho constitucional a la huelga, pero no tiene un derecho

constitucional a que el gobierno lo mantenga con un subsidio mientras él decide permanecer en estado de huelga". *Exhibit* 2.

Ante nos, el señor Morales afirma que la Sec. 308 del Reglamento del P.A.N., *supra*, es inconstitucional porque infringe las Secs. 17 y 18 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, que garantizan el derecho a huelga de los obreros. Su reclamo requiere que evaluemos si las condiciones de elegibilidad impuestas por el Departamento de Servicios Sociales en la citada Sec. 308 de este reglamento son inconstitucionales.

## II

La doctrina de las condiciones inconstitucionales se origina en Estados Unidos hace alrededor de setenta (70) años, pero se desarrolla con particular intensidad en la década de los sesenta (60) para proscribir que el Estado moderno deniegue servicios o beneficios públicos a una persona por ejercer un derecho constitucional. La norma se invoca con más frecuencia en el ocaso de la dicotomía clásica entre derecho y privilegio, favorecida por la jurisprudencia al comienzo del siglo, y se desarrolla paralelamente a la doctrina del debido proceso en su aspecto procesal. Véanse: *McAuliffe v. Mayor, Etc., of City of New Bedford*, 29 N.E. 517, 518 (1892); W.W. Van Alstyne, *The Demise of the Rights–Privilege Distinction in Constitutional Law*, 81 (Núm. 7) Harv. L. Rev. 1439 (1968). Su evolución ha sido una consecuencia natural del extraordinario crecimiento del Estado moderno y de los programas de bienestar público. C. Reich, *The New Property*, 73 Yale L.J. 733 (1964).

Aunque el Tribunal Supremo federal, desde *Lochner v. New York*, 198 U.S. 45 (1905), ha aplicado el escrutinio racional al considerar la legislación socioeconómica, en general ha rechazado la teoría de que el Estado puede imponer cualquier condición a beneficios públicos. Véanse: *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Sherbert v. Verner*, 374 U.S. 398 (1963); *Speiser v. Randall*,

357 U.S. 513 (1958); L. H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, Sec. 11-5, pág. 781. Partiendo de esta premisa, el Tribunal Supremo federal ha examinado los estatutos que condicionan un beneficio a que una persona elegible se abstenga de ejercer sus prerrogativas constitucionales utilizando distintos tipos de escrutinio judicial dependiendo de la naturaleza del programa gubernamental y de los derechos afectados. Véanse: K. Sullivan, *Unconstitutional Conditions*, 102 (Núm. 7) Harv. L. Rev. 1415 (1989); L. Alexander, *Understanding Constitutional Rights in a World of Optional Baselines*, 26 (Núm. 2) San Diego L. Rev. 175 (1989); R. Epstein, *Foreword Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 (Núm. 1) Harv. L. Rev. 5 (1988); Nota, *Unconstitutional Conditions*, 73 Harv. L. Rev. 1595 (1960).

■ La doctrina se ha invocado para prohibir que el gobierno: (1) imponga condiciones a exenciones contributivas o a empleos públicos que requieran el silencio o la lealtad política (*Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976); *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Speiser v. Randall*, supra); (2) exija que estén dispuestos a trabajar los sábados como condición de ser acreedor al fondo de desempleo (*Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136 (1987)), o (3) requiera que una emisora radial se abstenga de difundir editoriales a cambio de subsidio gubernamental (*F.C.C. v. League of Women Voters of California*, 468 U.S. 364 (1984)).

■ Por otro lado, también se ha utilizado esta norma para refrendar requisitos que inciden sobre derechos constitucionales. Por ejemplo, ha permitido que los estados no asignen fondos públicos para sufragar abortos a la misma vez que tienen programas prenatales. *Harris v. McRae*, 448 U.S. 297 (1980); *Maher v. Roe*, 432 U.S. 464 (1977). El Tribunal Supremo federal también ha aprobado que se le requiera a las corporaciones sin fines pecuniarios con exención contributiva que suspendan sus programas de cabildeo legislativo (*Regan v. Taxation. with Representation of Wash.*, 461 U.S. 540 (1983)), y en *Posadas de Puerto Rico Assoc.*

*v. Tourism Co.*, 478 U.S. 328 (1986), ha sostenido la ley que autorizaba al Departamento de Turismo prohibirle a los casinos con licencias del Estado Libre Asociado (en adelante E.L.A.) anunciar sus facilidades.

■ Finalmente, ha rechazado reclamaciones de que los requisitos de los programas de cupones de alimentos o de bienestar público infringen de forma significativa los derechos constitucionales de libertad de expresión y asociación, y la protección contra registros irrazonables. *Lyng v. Castillo*, 477 U.S. 635 (1986); *Wyman v. James*, 400 U.S. 309 (1971).

■ Recientemente el Tribunal Supremo federal se pronunció respecto a una controversia análoga a la del caso de autos en *Lyng v. Automobile Workers*, 485 U.S. 360 (1988). Ante ese Foro apelativo unas uniones obreras impugnaron la constitucionalidad de la Sec. 109 del *Omnibus Budget Reconciliation Act*, Pub. L. No. 97–35, 95 Stat. 357 (1981), que enmendó la ley federal de cupones de alimentos porque la exclusión de huelguistas de los beneficios del programa violaba sus derechos de libertad de expresión. En una extensa opinión el Tribunal Supremo federal concluyó que la legislación congresional tenía un motivo racional y no violaba la cláusula de igual protección de las leyes. También resolvió que la referida Sec. 109 (de huelguistas) no infringió los derechos de expresión y de asociación protegidos por la Constitución de Estados Unidos:

> El estatuto tampoco infringe los derechos de asociación de los individuos apelados y de sus uniones. Hemos reconocido que "uno de los fundamentos de nuestra sociedad es el derecho de los individuos a asociarse con otras personas para conseguir un fin común a través de medios legítimos" (NAACP v Claiborne Hardware Co., 458 US 886, 933, 73 L Ed 2d 1215, 102 S Ct 3409 (1982)), y nuestro reconocimiento de este derecho incluye la asociación de obreros individuales unidos con el propósito de hacer valer sus derechos legítimos. Véase, por ejemplo, Railroad Trainmen v Virginia, 377 US 1, 5–6, 12 L Ed 2d 89, 84 S Ct 1113, 27 Ohio Ops 2d 365, 94 Ohio L Abs 33, 11 ALR3d 1196 (1964). Sin embargo, en

este caso, la ley en cuestión no "interfiere 'directa o substancialmente'" con la capacidad de los apelados para asociarse con el propósito de alcanzar dicho fin. Lyng, supra, pág. 638, 91 L Ed 2d 527, 106 S Ct 2727. El estatuto no "ordena" a los apelados que no se asocien con el propósito de sostener una huelga, o con cualquier otro propósito, y no "evita" que ellos se asocien; tampoco restringe de manera significativa su capacidad para ello. Como ya hemos indicado con relación al efecto de este estatuto sobre la decisión de un invididuo a permanecer en su hogar o de abandonarlo, resulta "muy poco probable" que este estatuto impida que los individuos continúen asociándose en uniones para promover sus objetivos legítimos. (Traducción nuestra y escolio omitido.) *Lyng v. Automobile Workers*, supra, pág. 366.

La decisión parte de la premisa de que el estatuto no obliga a los obreros a suspender sus actividades huelgarias. Aunque acepta que las uniones y los obreros en huelga estarían mejor si recibieran cupones de alimentos, concluye que el derecho de asociación no exige que el Gobierno subsidie esta actividad:

El ejercicio del derecho a irse a la huelga inevitablemente expone al titular del derecho a dificultades económicas, pero no estamos inclinados a decidir que el derecho a la asociación requiere que el gobierno minimice este impacto haciendo a los huelguistas elegibles para recibir los cupones de alimentos. (Traducción nuestra.) *Lyng v. Automobile Workers*, supra, pág. 368.

Concluido este estudio de las decisiones del Tribunal Supremo federal sobre la doctrina de condiciones constitucionales y su aplicación a los requisitos impuestos a los huelguistas que solicitan cupones de alimentos, procede un examen de la norma según nuestro ordenamiento constitucional.

### III

La doctrina de condiciones inconstitucionales tiene su aceptación inicial en Puerto Rico en *Báez Cancel v. Alcalde Mun. de Guaynabo*, 100 D.P.R. 982 (1972). Al rechazar que un alcalde destituyera de su trabajo a empleados irregulares de un municipio por motivo de sus ideas políticas, allí afirmamos que el

"Estado en ninguna de sus múltiples funciones o servicios puede discriminar contra un ciudadano por el mero hecho de éste ser negro, ateo, o por sus ideas políticas. Cualquier otra interpretación enervaría su eficacia". Íd., pág. 987.

Aunque hasta la fecha la doctrina se ha utilizado para vindicar los derechos de empleados públicos —*Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486 (1990); *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113 (1989); *Ramos v. Srio. de Comercio*, 112 D.P.R. 514 (1982)— su alcance también se extiende a condiciones impuestas por el Estado que requieren que el beneficiario de asistencia social se abstenga de realizar una actividad constitucionalmente protegida. La doctrina es particularmente aplicable cuando el Gobierno impone una condición a un beneficio público que tiene el efecto de inducir al ciudadano a ceder un derecho individual o a limitar su autonomía al ejercer sus libertades de expresión, culto o asociación. Así se evita que el Estado aproveche estos programas para intencionalmente presionar indirectamente a unos ciudadanos a dejar de hacer valer unos derechos fundamentales. Véase J. Garvey, *The Powers and Duties of Government*, 26 San Diego L. Rev. 209 (1989).

Aunque el Estado no tiene el deber de proveer asistencia pública a todos los ciudadanos, una vez ofrece estos beneficios, los requisitos de elegibilidad no pueden ser arbitrarios ni pueden obligar a los ciudadanos elegibles a renunciar a sus derechos fundamentales para poder participar en el programa ni penalizarlos por hacer valer sus libertades. Véase K. Sullivan, *Unconstitutional Conditions and the Distribution of Liberty*, 26 (Núm. 2) San Diego L. Rev. 327 (1989).

Esta limitación constitucional no es de carácter absoluto y "en determinadas situaciones, puede ceder ante intereses colectivos de superior jerarquía", *Ramos v. Srio. de Comercio*, supra, pág. 519, que justifiquen la restricción de los derechos mediante un ponderado análisis de los intereses en conflicto. Véase, también, M. Ramírez Lavandero, *La doctrina de las*

*"condiciones inconstitucionales"* en Puerto Rico, 12 Rev. Jur. U.I.A., 111, 120 (1977). Una vez se prueba que un requisito de un programa de asistencia pública afecta un derecho fundamental, corresponde al Estado demostrar la existencia del "interés colectivo de superior jerarquía" y que la condición promueve su consecución.

Esto significa que el Estado puede imponer requisitos sobre los beneficios públicos. Pero cuando distribuye esta asistencia, debe hacerlo conforme a las limitaciones impuestas por nuestro ordenamiento constitucional. 2 *Treatise on Constitutional Law: Substance and Procedure* Sec. 17.5(c) (1986).

▬▬▬▬ Contrario a la Constitución de Estados Unidos, la nuestra consagra expresamente los derechos de los obreros a organizarse, a negociar colectivamente, a la huelga, al piquete y a otras actividades concertadas de singular importancia en nuestra vida democrática. Art. II, Secs. 16, 17 y 18, Const. E.L.A., L.P.R.A., Tomo 1; *J.R.T. v. Asoc. Servs. Médicos Hosp.*, 115 D.P.R. 360, 364 (1984); *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976); *Junta Rel. Trabajo v. Club Deportivo*, 84 D.P.R. 515 (1962). El legajo constituyente revela que estos derechos recibieron una cuidadosa atención en la Convención Constituyente. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. Universitaria, 1982, Vol. III, págs. 199–207. Aunque estos nuevos derechos sociales no tienen la misma dimensión histórica que los que representan aquella reserva de libertades del individuo frente al Estado, son de las pocas disposiciones que la propia Constitución aplica *erga omnes* —J.J. Álvarez, *La protección de los derechos humanos en Puerto Rico*, 57 Rev. Jur. U.P.R. 133, 153–155 (1988)— y que imponen unas obligaciones especiales a las tres (3) ramas del Gobierno de Puerto Rico. Trías Monge, *op. cit.*, págs. 199–201. Bajo este esquema constitucional, nuestro análisis de las condiciones establecidas en el caso de autos tienen que trascender los linderos marcados por el Tribunal Supremo federal en *Lyng v. Automobile Workers*, supra.

◼ Ante nos el peticionario expone que la Sec. 308 del Reglamento del P.A.N., *supra*, tiene la consecuencia de excluir a las familias de obreros en huelga del programa de asistencia nutricional y que penaliza al ejercicio de un derecho garantizado por nuestro ordenamiento constitucional. Su planteamiento requiere que mediante un análisis de estricto escrutinio judicial exploremos el interés perseguido por el E.L.A. al aprobar esta disposición y su efecto sobre los derechos de los obreros. *Ramos v. Srio. de Comercio*, supra, pág. 519.

IV

◼ El Programa de Asistencia Nutricional del Estado Libre Asociado se origina del proyecto federal de cupones de alimentos a través de una asignación especial de fondos del *Omnibus Budget Reconciliation Act* de 1981, que en el año fiscal 1986–1987 fue de $852,750,000. En conformidad con la legislación federal, el Departamento de Agricultura de Estados Unidos promulgó un reglamento que pautaba las normas del plan estatal requerido al Gobierno del E.L.A., 7 C.F.R. sec. 272 (1990), para que pudiese recibir la asignación de fondos en bloque que sustituyeran la distribución de cupones para comprar alimentos por la expedición de cheques que complementaran los ingresos de los beneficiarios.

◼ Entre estos requisitos se exigió que el E.L.A. se comprometiera a promulgar reglamentos compatibles con la legislación federal, e incluyeran la Sec. 109 del *Omnibus Budget and Reconciliation Act* de 1981, *supra*, que prohibió que los huelguistas pudiesen acogerse al programa de cupones de alimentos durante un conflicto obrero-patronal:

(3) Independientemente de cualquier otra disposición de ley, una familia no podrá participar en el programa de cupones de alimentos cuando un miembro de dicha familia, que no esté exento de los requisitos establecidos en el párrafo (1) de este inciso, para el registro de empleo, esté participando en una huelga, según se define en la sección 142(2) del Título 29, debido a una disputa laboral (que

no sea un cierre patronal) según se define en la sección 152(9) del Título 29: disponiéndose, que una familia no perderá su elegibilidad para participar en el programa de cupones de alimentos por el hecho de que uno de sus miembros se haya ido a la huelga si la familia era elegible para recibir los cupones de alimentos inmediatamente antes de la huelga, sin embargo, dicha familia no recibirá un aumento en su asignación por el hecho de que se hayan reducido los ingresos del miembro o de los miembros de la familia que se fue o se fueron a la huelga; disponiéndose, además, que dicha inelegibilidad no se aplicará a ninguna familia donde ninguno de los miembros se haya ido a la huelga, si alguno de los miembros de dicha familia se niega a aceptar empleo en una planta o local debido a una huelga o a un cierre patronal. (Traducción nuestra.) 7 U.S.C. sec. 2015(d)(3).

■ Aunque la intención congresional fue de conceder flexibilidad al E.L.A. para diseñar un programa de asistencia nutricional, *expresamente se exigió que para recibir esta asignación especial tenía que cumplir con todas las leyes y los reglamentos federales aplicables.* 7 C.F.R. sec. 285.1 *et seq.* (1990). El Secretario de Agricultura fue investido de amplios poderes para imponer las condiciones necesarias que garanticen que el E.L.A. cumpla cabalmente con los requisitos federales. 7 U.S.C. sec. 2028(b)(1)(B)(ii); 7 C.F.R. sec. 285.7 (1990).

■ Con estos propósitos, el Departamento de Agricultura federal requirió al E.L.A. que aprobara un plan estatal con la cláusula siguiente referente a huelguistas:

Las unidades familiares en las que uno o más de sus miembros están participando en una huelga serán inelegibles a menos que la unidad familiar sea elegible, incluyendo los ingresos del miembro que está participando en la huelga. (Traducción nuestra.) Plan Estatal de Operación para la Administración del Programa de Asistencia Nutricional del Estado Libre Asociado de Puerto Rico, Año Fiscal 1986–87, junio 1986, pág. 21, *Exhibit* I.

■ Para poder cumplir con estos requisitos federales y recibir los fondos disponibles, el E.L.A. promulgó el Reglamento Núm. 2882 del P.A.N. que fija los requisitos de elegibilidad

financiera e instituye un procedimiento para apelar cualquier decisión adversa al solicitante. Entre los criterios de elegibilidad se incluyó la citada Sec. 308 para cumplir con la limitación impuesta por el Congreso referente a los obreros en huelga:

308 — Huelguistas

Para fines del Programa se considerará huelguista a un empleado que participe en una acción concertada que conlleve una interrupción de las labores de trabajo con el propósito de imponer determinadas demandas al patrono.

No se considerarán huelguistas a empleados cuyo centro de trabajo sea cerrado por el patrono con el fin de resistir las demandas de éstos (cierre patronal) o aquellos que se encuentran reportados al Fondo del Seguro del Estado (F.S.E.) al momento de decretarse la huelga.

Las unidades familiares con uno o más miembros considerados huelguistas se certificarán conforme a los criterios de elegibilidad que aplican a las demás unidades familiares, *excepto que se consideran los ingresos recibidos por dichos miembros antes de decretarse la huelga, así como cualquier otro ingreso que reciban por concepto de beneficios por huelga o empleos temporeros durante este período.* (Énfasis en el original.) Reglamento Núm. 2882 del Programa de Asistencia Nutricional de 28 de junio de 1982 del Departamento de Servicios Sociales, *Exhibit* 4.

Aunque esta sección no constituye una prohibición absoluta que impide que los trabajadores se organicen o que recurran a la huelga, la misma dispone que al evaluar la solicitud del huelguista y el nivel de beneficios a que tiene derecho se contabilicen los ingresos por concepto de su empleo como si éste continuara devengándolos. Mientras a los otros beneficiarios se les determina su elegibilidad a base de los salarios que *realmente* reciben durante el período en cuestión, a los obreros en huelga se les calcula su estado financiero a base de los ingresos que recibían cuando trabajaban. Como resultado de esta disposición, a estas familias no se les considera la merma que efectivamente han tenido en sus ingresos desde que comenzó la huelga.

El efecto neto de esta medida es que una unidad familiar que era elegible antes de la huelga continúa recibiendo la misma

cantidad de fondos que disfrutaba anteriormente. Por otro lado, una unidad familiar que no era elegible antes de la huelga, no podrá acogerse a sus beneficios para compensar la reducción en sus ingresos durante el paro. Mientras los huelguistas permanezcan en sus hogares, estas familias no podrán ser elegibles al P.A.N. A estos obreros el Estado los ha colocado en una encrucijada entre sus lealtades familiares y sindicales, limitando su ámbito de acción y, por ende, afectando sus libertades para ejercer efectivamente sus derechos a recurrir a la huelga en los conflictos obrero-patronales.

■ Sin embargo, con esta medida el Estado persigue el interés apremiante de proveer un programa de asistencia nutricional a las familias indigentes de nuestro país que no tienen los ingresos para adquirir los alimentos básicos que necesitan para su supervivencia en nuestra sociedad. Como resultado de este programa, en el año fiscal 1986–1987 423,916 unidades familiares compuestas de 1,452,895 personas recibieron un subsidio económico de alrededor de $157.60 mensuales. Informe Económico al Gobernador de 1986–1987 de la Junta de Planificación de Puerto Rico, pág. X-14.

■ Desde sus orígenes, los programas de cupones de alimentos y de asistencia nutricional han tenido un extraordinario impacto socioeconómico sobre el país: han contribuido a estabilizar la demanda agregada de la economía mediante la creación de más de cincuenta mil (50,000) empleos directos e indirectos y el mejoramiento de los niveles alimentarios de más de la mitad de nuestra población. Véanse: Choudhury, *The Food Stamp Program and Unemployment in Puerto Rico*, Departamento de Servicios Sociales, 1978; Corplan, *Economic and Nutritional Impact of the Nutritional Assistance Program (PAN) in Puerto Rico*, 1983.

■ Para proveer la ayuda económica que necesitaban los 1.4 millones de personas indigentes era indispensable obtener los recursos financieros asignados por el Congreso de Estados Unidos con las condiciones impuestas según fueron avaladas por el

Tribunal Supremo federal. *Lyng v. Automobile Workers*, supra. De lo contrario, el E.L.A. no hubiese podido sustituir el programa de cupones de alimentos con el de asistencia nutricional, con lo que se hubiera privado a las familias más necesitadas del país de un subsidio económico vital para disfrutar un nivel adecuado de vida, especialmente en cuanto a su alimentación, y así cumplir con los objetivos originalmente concebidos en la "frustrada" Sec. 20 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. Véase *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414, 421 (1985).

Al aprobar esta reglamentación, el E.L.A. también refrendó los objetivos trazados por el Congreso de Estados Unidos de mantener su neutralidad en los conflictos obrero-patronales y evitó así que los huelguistas recibieran asistencia económica del Estado, relevando a los sindicatos de las presiones de su matrícula causadas por la reducción temporera de sus ingresos. *Lyng v. Automobile Workers*, supra, pág. 369. Una disposición similar también está incluida en la Ley de Seguridad de Empleo de Puerto Rico que descalifica a un trabajador por "aquella semana en que su desempleo se debiera a paro en el trabajo que existiera entonces debido a alguna disputa obrera en la fábrica, establecimiento u otro local en que dicha persona estuviera o hubiera estado últimamente trabajando". 29 L.P.R.A. sec. 704(b)(6). Véase, también, *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471 (1977).

Tanto en Puerto Rico como en Estados Unidos, la política pública en el campo laboral ha sido dejar que sea el proceso de negociación colectiva el que regule los términos y las condiciones del empleo sin interferencia del Estado. Véanse: Sec. 1, *Labor–Management Relations Act*, 1947, 29 U.S.C. sec. 151; Art. 1 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 62(4). No empece la promulgación de leyes especiales que reglamentan algunos términos y algunas condiciones del empleo, las disposiciones de las leyes de relaciones del trabajo, en lo que respecta a la negociación colectiva, "se limitan a reglamen-

tar el proceso mediante el cual se concreta la negociación sin interferir con el contenido de la misma ni con los aspectos sustantivos de las discusiones e intercambios que se dan en el proceso". D. Fernández y C. Romany, *Derecho Laboral: Casos y Materiales*, Río Piedras, Ed. U.P.R., 1987, T. I, pág. 753.

■ Al promulgar la Sec. 308 del Reglamento del P.A.N., *supra*, el Estado tenía un interés colectivo preponderante en evitar que sus programas de asistencia económica a los marginados y desempleados tuvieran el efecto de ayudar a una de las partes en la compleja dinámica que surge en un conflicto huelgario.

■ En estas circunstancias, el interés público de que el Estado pueda estar en condiciones de proveer un programa de asistencia social que asegure un nivel adecuado de vida para la mitad de nuestra población supera las limitaciones temporeras impuestas por la citada Sec. 308 de dicho reglamento, al derecho de los trabajadores y justifica la actuación del Estado en favor de toda la comunidad.

■ En nuestro ordenamiento constitucional corresponde al Estado asegurar el bienestar general, la seguridad y la salud de la población para que las personas puedan estar en posición de ejercer sus derechos individuales:

> La protección más liberal de los derechos del individuo, que es la establecida en esta carta de derechos, no puede perder de vista el básico principio de que la salud del pueblo es la suprema ley. Los derechos individuales tienen que entenderse dentro del cuadro general de la *sociedad con arreglo a las limitaciones inherentes a la vida en común.* (Énfasis suplido.) Informe de la Comisión de la Carta de Derechos, 4 Diario de Sesiones de la Convención Constituyente 2576 (1951).

Por las razones expuestas anteriormente, *se expide el auto y se confirma la decisión del Tribunal Superior.*

El Juez Asociado Señor Negrón García emitió opinión disidente. El Juez Asociado Señor Ortiz se inhibió.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

I

No albergamos duda alguna de la inconstitucionalidad de la Sec. 308 del Reglamento Núm. 2882 del Programa de Asistencia Nutricional del Departamento de Servicios Sociales de 28 de junio de 1982 (en adelante Reglamento del P.A.N.). La misma menoscaba el derecho a huelga de los obreros y, por sus efectos perjudiciales e impacto negativo y directo en la elegibilidad financiera de su núcleo familiar, los obliga a abstenerse de ejercitarlo.

Definitivamente la regla choca directamente e infringe las Secs. 17 y 18 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, que —distinto a la federal— garantizan *expresamente* el derecho a huelga a los trabajadores.(1) *J.R.T. v. Asoc. C. Playa Azul I*, 117 D.P.R. 20, 33 (1986); *J.R.T. v. Asoc. Servs. Médicos Hosp.*, 115 D.P.R. 360, 364 (1984); *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976); *Junta Rel. Trabajo v. Club Deportivo*, 84 D.P.R. 515, 519 (1962).

---

(1) "*Sec. 17. [Derecho a organizarse y negociar colectivamente]*

"Los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán el derecho a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar."

"*Sec. 18. [Derecho a la huelga, a establecer piquetes, etc.]*

"A fin de asegurar el derecho a organizarse y a negociar colectivamente, los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán, en sus relaciones directas con sus propios patronos, el derecho a la huelga, a establecer piquetes y a llevar a cabo otras actividades concertadas legales.

"Nada de lo contenido en esta sección menoscabará la facultad de la Asamblea Legislativa de aprobar leyes para casos de grave emergencia cuando estén claramente en peligro la salud o la seguridad públicas, o los servicios públicos esenciales." Art. II, Secs. 17 y 18, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, págs. 329 y 330.

Reconocemos que en *Lyng v. Automobile Workers*, 485 U.S. 360 (1988), en cerrada decisión (cinco (5) a tres (3)), el Tribunal Supremo federal sostuvo la constitucionalidad de una disposición análoga a la Sec. 308 del Reglamento del P.A.N., *supra*. Puntualizamos, sin embargo, que el derecho a huelga en Estados Unidos no está consagrado específicamente —como ocurre en Puerto Rico— sino que es una actividad protegida por la Primera Enmienda —libertad de expresión y asociación— y por la Quinta Enmienda. Ello·explica la razón por la cual la mayoría allí utilizó el *escrutinio deferencial* para dilucidar la controversia constitucional. Aun así, como señalara el Juez Marshall, autor de la opinión disidente, el Estado *no pudo probar un nexo racional* entre la clasificación establecida por el Reglamento del P.A.N. y los supuestos objetivos gubernamentales legítimos: reducir los gastos federales, canalizar los limitados fondos públicos hacia los más necesitados y, *a la par, mantener la neutralidad en los conflictos obrero-patronales.*

Ante el sitial de preeminencia que goza el derecho a la huelga —al decir de la Asamblea Constituyente, "supremo recurso final en la reclamación del derecho obrero"—[2] debió este Foro evaluar la constitucionalidad del reglamento a base del análisis de escrutinio estricto. Aunque la mayoría afirma que utiliza este criterio (opinión mayoritaria, págs. 105–106), a poco examinemos los argumentos esbozados (opinión mayoritaria, págs. 107–111), notamos que éstos se reducen a una mera descripción de los beneficios económicos del P.A.N. De haberse seguido verdaderamente la metodología adjudicativa de escrutinio estricto, hubiese aflorado su impacto sustancial disuasivo (*chilling effect*) sobre el derecho a la huelga, la injusticia recaída en el núcleo familiar del obrero y la ausencia de neutralidad gubernamental en los conflictos huelgarios.

Por responder a una legislación y reglamentación federal insoslayable, a igual resultado arribaríamos bajo el enfoque

---

[2]   4 Diario de Sesiones de la Convención Constituyente 2575 (1951).

mayoritario predicado en la denominada *doctrina de condiciones inconstitucionales*. Nos explicamos.

## II

En su correcta dimensión, los hechos del caso de autos trascienden esa estricta controversia de neutralidad del Estado en los conflictos obrero-patronales y se internan en la esencia de las relaciones políticas, económicas y constitucionales entre Puerto Rico y Estados Unidos. Aunque la opinión mayoritaria no lo examina a fondo, *en realidad se plantea un asunto que indirectamente gira en torno a la supremacía de la reglamentación y legislación federal sobre la Constitución de Puerto Rico*.[3] Al promulgar el Reglamento del P.A.N., el gobierno puertorriqueño se confrontó con la siguiente disyuntiva: ¿adopta una norma que violenta y menoscaba el derecho constitucional a la huelga o no cualifica para la obtención de los fondos federales necesarios para poner en vigor el Programa de Asistencia Nutricional?

Al igual que ocurre con los habitantes de los cincuenta estados de los Estados Unidos, las personas en Puerto Rico tienen, además de la Constitución federal, otra fuente de garantías constitucionales: la Constitución de Puerto Rico. A diferencia de las garantías que surgen de la Constitución federal, que obligan tanto al gobierno federal como al puertorriqueño, los derechos constitucionales reconocidos por la Constitución de Puerto Rico sólo imponen obligaciones al gobierno insular y, en algunas situaciones, a las personas particulares, mas no al gobierno federal y sus funcionarios. *Ello es resultado lógico de la operación de la cláusula de supremacía de la Constitución federal.*

*Lo anterior significa que una disposición constitucional estatal o puertorriqueña puede quedar por tanto invalidada por una ley*

---

(3) El Art. VI, Cl. 2 de la Constitución federal dispone: "La presente Constitución, las leyes de los Estados Unidos que en virtud de ella se aprobaren y todos los tratados celebrados o que se celebraren bajo la autoridad de los Estados Unidos serán la suprema ley del país. Los jueces de cada estado estarán obligados a observarla aun cuando hubiere alguna disposición en contrario en la Constitución o en las leyes de cualquier estado." Const. EE.UU., L.P.R.A., Tomo 1, ed. 1982, pág. 182.

*federal adoptada al amparo de alguno de los poderes que la Constitución federal confiere al Congreso.* Significa igualmente que una disposición constitucional estatal o puertorriqueña *no ata a un actor federal cuya actuación esté autorizada por la ley federal.* (Citas omitidas y énfasis suplido.) J.J. Álvarez, *La protección de los derechos humanos en Puerto Rico,* LVII Rev. Jur. U.P.R. 133, 150–151 (1988). Véase, además, *United States v. Quinones,* 758 F.2d 40 (1er Cir. 1985), en que la Corte de Apelaciones de Estados Unidos para el Primer Circuito resolvió la legalidad de las intercepciones telefónicas ordenadas por las cortes federales, no obstante la prohibición contenida en el Art. II, Sec. 10 de nuestra Constitución, L.P.R.A., Tomo 1.

Por esta razón, no podemos suscribir los asertos de la opinión mayoritaria en cuanto a que "[a]l promulgar la Sec. 308 del Reglamento del P.A.N., *supra,* el Estado [P.R.] tenía un interés colectivo preponderante en evitar que sus programas de asistencia económica a los marginados y desempleados tuvieran el efecto de ayudar a una de las partes en la compleja dinámica que surge en un conflicto huelgario". Opinión mayoritaria, pág. 112. NO EXISTE LA MÁS MÍNIMA PRUEBA DE QUE ESE FUERA EL OBJETIVO REAL DEL ESTADO. POR EL CONTRARIO, TODO DEMUESTRA QUE FUE UNA DE LAS CONDICIONES IMPUESTAS POR EL CONGRESO NORTEAMERICANO. El laudable interés público de proveer asistencia social a buena parte de la población explica por qué se adoptó la regla, pero no resuelve satisfactoriamente el planteamiento constitucional. Ambos asuntos, aunque están relacionados, son completamente separables.

¿Qué sucedería si este Tribunal declarara inconstitucional la citada Sec. 308 del Reglamento del P.A.N.? La respuesta inmediata es evidente: se suspendería la asignación de los fondos federales del programa y, en este sentido, ciertamente no habría *opciones.*

En estas circunstancias, sin ambajes y entelequias jurídicas, debió la mayoría del Tribunal reconocer —como única razón de decidir *(ratio decidendi)*— que esa consecuencia económica negativa incide decisivamente, y que en realidad estamos ante una

de las múltiples instancias en que la voluntad del Congreso norteamericano prevalece por encima de nuestra Constitución y cualquier otra interpretación en contrario de este Foro judicial. *No hay margen, pues, para una adjudicación legítimamente autonómica.*