Aponte Jiménez, Juez Ponente
*1239 TEXTO COMPLETO DE LA RESOLUCION
Varios empleados municipales despedidos por el otrora alcalde del Municipio de Coamo, Hon. Carlos Luis Torres, nos solicitan la revocación de una resolución emitida por la Junta de Apelaciones del Sistema de Administración de Personal (en adelante "J.A.S.A.P.”), negándose a acoger una apelación interpuesta por once (11), de treinta y nueve (39) empleados municipales cesanteados por el Municipio de Coamo, en lo sucesivo "el Municipio", a principios del año 1989. Analizados los alegatos de las partes y la transcripción de las vistas celebradas por la J.A.S.A.P., a la luz de la normativa estatutaria, reglamentaria y jurisprudencial aplicable, acordamos confirmar la resolución recurrida.
Los hechos del presente litigio se remontan a la contienda de dos miembros del Partido Popular Democrático (P.P.D). celebrada en el 1988. El entonces miembro de la Camara de Representantes de Puerto Rico, Hon. Carlos Luis Torres, en adelante, "Torres", reto en una primaria para el cargo de alcalde de Coamo al entonces incumbente, Hon. Ramón Norat Zayas, en adelante "Norat Zayas". Ambos eran correligionarios del Partido Popular Democrático (P.P.D). El primero derrotó al segundo en la primaria celebrada. Posteriormente, resultó electo alcalde en las elecciones generales de ese mismo año. Luego de tomar posesión de su cargo, Torres despidió a treinta y nueve (39) empleados municipales, en aquel momento clasificados, en su mayoría, como "jornaleros". Once (11) de ellos presentaron una apelación ante la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P). Alegaron que las cesantías estuvieron motivadas por razones políticas. Adujeron, en esencia, que durante la primaria del P.P.D. para elegir su candidato a alcalde, la mayoría de ellos apoyaron activamente la candidatura a la reelección del derrotado incumbente, Norat Zayas. Por ello, como consecuencia, una vez el alcalde electo asumió las responsabilidades de su nuevo cargo, en un acto de "revanchismopolítico", prescindió de sus servicios como empleados municipales.
El Alcalde y el Municipio contestaron la apelación. Negaron las alegaciones de discrimen político. A su vez defendieron la acción de despedir empleados municipales. Alegaron una seria crisis fiscal y económica en las arcas municipales. Asimismo, señalaron que los empleados municipales siempre estuvieron al tanto de la posibilidad de cesantías debido a la aludida crisis fiscal. Para dilucidar la controversia factual sobre los motivos, razones o causas de las susodichas cesantías, la J.A.S.A.P. celebró varias vistas ante un Oficial Examinador. Las partes tuvieron oportunidad de desfilar abundante prueba testimonial, documental y pericial en apoyo de sus respectivas alegaciones. Concluido el proceso de vistas públicas, el Oficial Examinador designado produjo un informe con recomendaciones. El mismo fue acogido y adoptado por la J.A.S.A.P. como su decisión del caso. Concluyó, en síntesis, que, contrario a lo que reclamaban los empleados municipales apelantes, las cesantías no obedecieron a discrimen político. Afirmó que de los empleados que se quedaron trabajando en el Municipio, habían partidiarios tanto de Torres como de Norat Zayas. Encontró que la .LLsión de decretar las cesantías fue, entre otras, una saludable medida administrativa tomada para ayudar a resolver la seria crisis fiscal y económica por la cual atravesaba el Municipio. Determinó, además, que el alcalde Torres cumplió con las disposiciones estatutarias y reglamentarias aplicables *1240 referente a las cesantías decretadas.
Insatisfechos con tal dictamen, once (11) empleados municipales, de los treinta y nueve (39) cesanteados, recurren ante nos. Apuntan que incidió la J.A.S.A.P.: Primero, "[a]l mantener a los trabajadores apelantes-recurrentes como 'jornaleros' o transitorios... todo lo cual es ilegal"-, segundo, "[a]l omitir resolver que el trato aplicado a los aquí apelantes-recurrentes es inconstitucional basado en discrimen por ideas políticas"; tercero, la resolución recurrida "[n]o está basada en el balance más racional, justiciero y jurídico de la prueba"; y cuarto, "[ají negar a los apelantes-recurrentes el derecho a ser reinstalados en sus respectivas posiciones, el derecho a la permanencia en sus empleos y al pago de los haberes dejados de percibir". Dado que el meollo de la controversia ante nuestra consideración estriba en las alegaciones relacionadas con el discrimen político, especialmente en torno a la apreciación de la prueba presentada, comenzaremos discutiendo el error concerniente a este particular.
De entrada reconocemos que nuestra facultad apelativa para intervenir con las determinaciones de hechos de un organismo administrativo cuasi-judicial no es una ilimitada e irrestricta. La See. 4.5 de la Ley de Procedimiento Administrativo Uniforme, según enmendada, 31 L.P.R.A. sec. 2175, dispone que las determinaciones de hechos de los organismos administrativos serán sostenidas por los tribunales si se basan en evidencia sustancial obrante en el expediente administrativo. Lo anterior recoge estatutariamente "[l]a normativa jurisprudencial de que, de ordinario, los tribunales no intervendrán con las determinaciones de hechos de un organismo administrativo si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo considerado en su totalidad." Metropolitana, S.E. v. A.R.P.E., 95 J.T.S. 39, a la pág. 767.
La parte que cuestione las determinaciones de hechos de un ente administrativo, o que entienda que alguna de éstas no está sostenida por evidencia sustancial, le compete demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia sobre la cual se sustentan las determinaciones de hechos impugnadas hasta el punto de que un tribunal no pueda razonablemente concluir que no están sostenidas por evidencia sustancial, o que no reflejan una apreciación justa de la prueba aportada. Ibid., Hilton Hotels v. Junta de Salario Mínimo, 74 D.P.R. 670, 686 (1953). Quien impugne las determinaciones de hechos de la J.A.S.A.P. debe colocar al tribunal apelativo en posición de descartarlas apuntando cuál es la evidencia obrante en el expediente administrativo que tiende a apoyar su contención de error en la apreciación de la prueba. Conscientes de lo que antecede, nos percatamos de que, a pesar de su extenso escrito, los empleados municipales recurrentes no nos incluyen la evidencia obrante en el expediente de la J.A.S.A.P. demostrativa de que la llamada crisis fiscal del Municipio fue un subterfugio para encubrir el alegado discrimen político. Sólo elevaron ante este Foro una transcripción de la prueba oral presentada en las vistas públicas celebradas por la J.A.S.A.P. Siendo este el caso, ciertamente, los recurrentes no han cumplido de manera adecuada con su carga de poner a este Tribunal en posición de intervenir con la apreciación de la prueba realizada por la J.A.S.A.P.
Independientemente de lo anterior, no se nos escapa la importantísima prohibición constitucional contra el discrimen en el empleo público municipal por motivos políticos. Art. II, Sec. 1, Constitución del Estado Libre Asociado de Puerto Rico; Báez Cancel v. Municipio de Guaynabo, 100 D.P.R. 982 (1972). Esa prohibición consagra el derecho de todo ciudadano a comulgar con la idea política de su preferencia sin que ello menoscabe sus relaciones con el Estado. Colón v. C.R.U.V., 115 D.P.R. 503, 504 (1984). Dada la relevancia que reviste semejante alegación, nos involucramos en la tarea de examinar detenidamente la transcripción de las vistas celebradas ante el Oficial Examinador designado por la J.A.S.A.P. Allí aparece el testimonio del Director de Contabilidad del Municipio, quien trabajó tanto en la administración del señor Norat Zayas como en la del señor Torres. También figura el del señor Rafael E. Rivera, Contador Público Autorizado (C.P.A)., contratado por el Municipio desde los tiempos de Norat Zayas. Este fue quien evaluó la condición fiscal de las arcas municipales; supervisó el desembolso de un empréstito de diez (10) millones otorgado al Municipio por el Banco Gubernamental de Fomento de Puerto Rico; y también preparó los informes financieros de la situación fiscal municipál que se usaron como justificación de la necesidad de las cesantías. Como testigo de refutación y perito económico de los empleados municipales recurrentes, testificó el señor José Suárez Torres, también C.P.A. Todos esos testigos declararon sobre la pobre condición fiscal y económica del Municipio.
*1241 Luego de cuidadosamente estudiar dichos testimonios, creemos que la apreciación de la J.A.S.A.P. referente a la seria crisis fiscal y económica que afrontaba el Municipio al momento de tomar la decisión de prescindir de los servicios de los empleados municipales recurrentes, está ampliamente sostenida por la prueba. Tanto el Director de Contabilidad como el contador Rivera atestiguaron sobre el sobregiro de varias cuentas municipales, muy particularmente aquellas relacionadas a salarios y beneficios marginales. Asimismo, declararon sobre el déficit presupuestario acumulado por el Municipio, alrededor de nueve millones de dólares, y los problemas para pagar un empréstito de diez millones de dólares otorgado por el Banco Gubernamental de Fomento, situación que incluso los obligó a solicitar y obtener-una moratoria de pago. De igual forma, la administración municipal de Coamo tuvo que tomar otra serie-de- medidas administrativas que confirman la.delicada, salud fiscal del Municipio, a saber: Renuncia del alcalde Torres a su sueldo por espacio de seis meses; reducción de 25% del salario de los empleados de confianza; reducción en la jornada de trabajo de todos los empleados municipales; licencias sin sueldo; congelación de plazas; y la disminución en la compra de materiales y equipo al mínimo indispensable.
En el presente caso no hay duda de que existía una justificación para el despido, i.e., la difícil situación fiscal y económica del-Municipio. Si bien es cierto, como indican los-empleados recurrentes, que el informe preparado por el C.P.A. Rivera se fundó, en parte, en una compilación no auditada de los estados financieros del Municipio, ello no implica que su análisis y recomendaciones como contador no puedan servir de base para la toma de decisiones en la administración municipal para superar la grave situación económica que atraviesa el Municipio al entrar en funciones el alcalde electo Torres. Del testimonio de ambos contadores se colige que una compilación no auditada es un procedimiento aceptado por las autoridades en el campo de la contabilidad cuando resulta impracticable realizar una auditoría, como por ejemplo sería la existencia de un deficiente sistema de contabilidad, tal como sucedía en el Municipio. La pretensión de los empleados recurrentes de que sólo mediante una auditoría completa de las finanzas municipales es que se podría detectar una crisis fiscal que justificara las cesantías, sin que quepa otro tipo de análisis de contabilidad, nos parece que soslaya excesivamente el valor probatorio de otros procedimientos contables como la compilación de estados financieros no auditados.
Aun cuando el apéndice del alegato de los empleados recurrentes no incluye la evidencia que desfiló ante el Oficial Examinador sobre la condición fiscal y económica del Municipio, estudiamos la transcripción de los procedimientos en ánimo de escudriñar la evidencia para descartar que la alegada crisis económica del Municipio fuera un subterfugio para encubrir el discrimen político. Olivieri Morales v. Pierluisi, 113 D.P.R. 790, 791 (1983); Báez Cancel v. Municipio de Guaynabo, supra. Encontramos lo contrario. Concluido nuestro análisis y considerados los testimonios que ante sí tuvo el Oficial Examinador, no albergamos duda alguna de que la determinación sobre la crisis fiscal que enfrentaba el Municipio está sostenida por la prueba. Es más, como antes señalado, quedó demostrado que las cesantías sólo fueron unas de varias medidas correctivas tomadas por la nueva administración municipal con el objetivo de mejorar la difícil situación financiera heredada por el Alcalde Torres de la pasada administración de Norat Zayas.
Por otro lado, los empleados municipales recurrentes no lograron demostrar que fueron sustituidos por otros que fueran partidarios del nuevo alcalde Tones. De hecho, una de las empleadas municipales recurrentes admitió durante la vista que apoyó a Torres en las primarias del P.P.D. Otra de las recunentes trabajó en un programa federal administrado por el Municipio durante seis (6) meses luego de su separación de su empleo municipal. Igualmente, tampoco tenemos constancia de que todos o una gran parte de los empleados municipales despedidos apoyaran al derrotado Norat Zayas, o que todos los que se quedaron eran seguidores del victorioso candidato Torres.
La determinación a la que hemos llegado en el sentido de que la verdadera razón para el despido de los recurrentes fue la falta de fondos en el Municipio, dada su difícil situación fiscal, y no el discrimen político, no concluye nuestra discusión. Nos corresponde atender otros señalamientos que más bien van dirigidos, primero, a cuestionar el status de "jornaleros" que ostentaban nueve (9) de los empleados municipales recurrentes al momento de decretarse la separación de sus empleos, y, :._0,..ndo, impugnar el plan de cesantías utilizado para establecer el orden en el cual se llevarían a cabo las cesantías. Alegan los recurrentes que dicho plan no fue aprobado de acuerdo a la ley, porque no se obtuvo la aprobación de la Asamblea Municipal de Coamo.
*1242 En Pizarro v. Municipio de Carolina, 112 D.P.R. 822, 827-28 (1982), se aclaró de una vez y por todas que la Ley de Personal del Servicio Público, Ley Núm. 5 de 14 de febrero de 1975, 3 L.P.R.A. sees. 1301 et seq., no reconoce el status de empleado irregular o "jornalero" en el empleo público de Puerto Rico. La misma, sólo reconoce empleados municipales de carrera, de confianza o transitorios, a quienes les cobijan los derechos y salvaguardas procesales que dicha ley les concede. 3 L.P.R.A. secs. 1350-53, 1421(8); Pizarro v. Municipio de Carolina, supra; Orta v. [Padilla] Ayala, 92 J.T.S. 96. Siendo ese el caso, mantener "jornaleros" dentro del sistema de personal municipal constituye un acto contrario a la ley. Tal es el espíritu del Art. 8 de la Ley de Personal al imponer la obligación a los municipios de convertir los empleados irregulares a regulares, o sea de carrera, si cumplen con los requisitos allí dispuestos. 3 L.P.R.A. sec. 711(g); Orta v. [Padilla]
Para este Foro resulta imposible determinar si los nueve (9) empleados municipales recurrentes clasificados como irregulares o "jornaleros" cumplían con todos los requisitos de ley para convertirse en empleados regulares o de carrera. Sin embargo, a juicio nuestro, dado el hecho de que las separaciones de empleo estaban justificadas, es realmente inmaterial que los empleados "jornaleros" no hayan sido clasificados como regulares, tal como dispone la ley. En ese sentido, lo importante no es si a los empleados recurrentes se les mantuvo ilegalmente clasificados como "jornaleros" sino, aun cuando así hubiese sido, si a éstos se le violaron los derechos de retención de empleo que contempla la Ley de Personal y el Reglamento de Personal: áreas Esenciales al Principio de Mérito, tal como si fueran empleados regulares o de carrera. Pizarro v. Municipio de Carolina, supra. En última instancia, a eso se reduce el beneficio que la ley les concede y brinda.
Cuando, como en el caso de autos, el motivo o causa de la separación del empleo es la crisis fiscal del Municipio, o sea la falta de fondos, la Sección 4.6 (6)(a) de la Ley de Personal dispone que se podrán decretar cesantías sin que ello se entienda como una destitución. 3 L.P.R.A. see. 1336 (6)(a). Para darle contenido específico al procedimiento de cesantías, la Sección 9.3 del Reglamento de Personal: áreas Esenciales al Principio de Mérito, recoge un método a través del cual podrían las mismas decretarse por falta de fondos. Por su parte, el Art. 10.09 de la Ley Orgánica de los Municipios, 21 L.P.R.A. see. 3359, (derogada por la Ley Núm. 81 de 30 de agosto de 1991, pero vigente al ocurrir los hechos que dieron paso al presente caso) establecía que los municipios de Puerto Rico podían separar del servicio público a cualquier empleado sin que esto se entendiese como una destitución, en armonía con la antes mencionada Sección 4.6 de la Ley de Personal, supra. Resulta de rigor destacar que de los autos ante nos, ni de las comparecencias escritas de las partes, surge que el Reglamento de Personal de Coamo no guardase conformidad con el Reglamento de Personal: áreas Esenciales al Principio de Mérito, en relación con los derechos de retención de empleos que garantiza la Ley de Personal. Ello tampoco se levantó ante J.A.S.A.P., ni ante este Tribunal.
De otra parte, argumentan los empleados recurrentes que el plan de cesantías requerido por la Sección 9.3 del Reglamento de Personal: áreas Esenciales al Principio de Mérito, en el caso de los gobiernos municipales, debe ser aprobado por la asamblea municipal en virtud del Art. 4.18 de la Ley Orgánica de los Municipios, 21 L.P.R.A. see. 3068, (también derogada por la Ley Núm. 81 de 30 de agosto de 1991). Si bien es cierto que esta disposición estatutaria otorga a las asambleas municipales la facultad de aprobar los reglamentos del sistema de personal municipal, el plan de cesantías, como bien apunta J.A.S.A.P. no es un "reglamento" sino, más bien, un método a través del cual la autoridad nominadora puede válidamente separar empleados regulares debido a la falta de fondos o trabajo. El Municipio, conforme el Art. 10.09, supra, adoptó el método —plan de cesantías— esbozado en la Sección 9.3 del Reglamento de Personal: áreas Esenciales al Principio de Mérito. La misma requiere que para poder separar del servicio público a empleados municipales por razón de falta de fondos, el Municipio debe preparar un plan de cesantías, tomando en consideración la eficiencia y tiempo de servicio de los empleados con el ulterior propósito de que primero se separen de empleo aquellos menos eficientes o con menos tiempo de servicio. Véase, Orta v. [Padilla] Ayala, supra. A falta de criterios para determinar la eficiencia de los empleados, como ocurrió aquí, se atenderá a la antigüedad de éstos en su empleo para establecer el orden de las cesantías. Así lo hizo el Municipio.
Resolvemos, en consecuencia, que no era necesaria la aprobación del plan de cesantías por parte de la Asamblea Municipal. La Ley Orgánica de los Municipios, la Ley de Personal y su Reglamento habilitador, de ninguna manera exigen ni contemplan tal aprobación legislativa. Se trata más bien de un acto que a todas luces es de naturaleza puramente administrativa. De ahí interpretamos que cuando *1243 el plan de cesantías adoptado por un alcalde cumple con la Sección 9.3 del Reglamento de Personal, la ley no exige una ulterior aprobación de la Asamblea Municipal. No existiendo ningún otro señalamiento en torno a la corrección del procedimiento seguido, por el Municipio al implantar el plan de cesantías con respecto a los nueve (9) empleados recurrentes clasificados como -"jornaleros", se cumplió con las disposiciones pertinentes de retención en el empleo cuando la separación ocurre debido a falta de fondos, tal como lo determinó la J.A.S.A.P.
No obstante lo anterior, hay dos (2) de los recurrentes que fueron concebidos por el Municipio y por la J.A.S.A.P. como empleados con nombramientos-transitorios, a quienes le expiró el-término de su contrato y no le fue renovado por el Municipio. Sobre ese extremo, sabido es que los empleados transitorios no tienen una expectativa legítima de empleo más allá del término de su nombramiento. Orta v. [Padilla] Ayala, supra, a la pág. 9736; Departamento de Recursos Naturales v. Correa, 118 D.P.R. 689, 697 (1987). Tampoco hay controversia en cuanto a que la efectividad de la separación de esos dos (2) empleados transitorios recurrentes ocurrió una vez expirado su nombramiento. Argumentan éstos que su cesantía fue ilegal debido a que antes, a mediados de 1988, siendo alcalde Norat Zayas, fueron ilegalmente reclasificados de la categoría de "jornaleros" a transitorios cuando tenían derecho a ser-clasificados como empleados regulares a.tenor de la'Ley-de Personal. El problema con este argumento es que la acción del Municipio de cambiar a los recurrentes de "jornaleros" a transitorios es una distinta y separada de la decisión de no extender un nuevo nombramiento a esos dos (2) empleados transitorios recurrentes. De éstos haber estado en desacuerdo con el mencionado cambio tenían treinta (30) días para apelar ante la J.A.S.A.P., contados a partir de la notificación de la acción o decisión objeto de la apelación. Véase, 3 L.P.R.A. secs. 1394 y 1395. Al no hacerlo así, impide que podamos ahora, al revisar un recurso de apelación presentado ante la J.A.S.A.P. por una acción distinta, permitir que colateralmente se ataque una decisión del Municipio que debieron los recurrentes haber apelado dentro de los treinta (30) días de su notificación y no lo hicieron. En consecuencia, no cometió error la J.A.S.A.P. al concluir que los dos (2) apelantes con nombramiento transitorio no tenían ninguna causa de acción contra el Municipio por razón de no habérsele extendido su contrato como empleados transitorios después de su vencimiento.
Finalmente, atendemos el señalamiento consistente en que "transcurridos seis (6) meses de concluida la vista en sus méritos, la Junta tenía que conceder lo solicitado por el recurrente". Los empleados municipales confunden las disposiciones de las secs. 3.13(g) y 3.14 de la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sees. 2163 y 2164. La primera establece que los procedimientos administrativos adjudicativos deberán ser resueltos en un término de seis (6) meses desde su radicación, salvo circunstancias excepcionales. La segunda dispone que las órdenes o resoluciones finales de los organismos administrativos deberán ser emitidas "por escrito dentro de noventa (90) días después de concluida la vista [administrativa] o después de la radicación de las propuestas determinaciones de hechos y conclusiones de derecho, a menos que este término sea renunciado o ampliado con el consentimiento escrito de todas las partes o por causa justificada." A la luz de estas disposiciones nos solicitan que adjudiquemos sus derechos en forma completa. Si lo que pretenden es que revoquemos el dictamen de la J.A.S.A.P. porque no se cumplió con los términos antes mencionados, no tienen razón. En lo concerniente a los términos para resolver, el Tribunal Supremo ha sido consecuente en aplicar la norma general de que éstos son de naturaleza directiva. Cuando el legislador ha querido que un término para resolver un asunto sea fatal o jurisdiccional lo establece expresamente en la ley. Pueblo v. Mojica Cruz, 115 D.P.R. 569, 574-75 (1984). Véase, además, Rodríguez v. Alcover, 78 D.P.R. 822, 825 (1955). Las disposiciones señaladas, no tenemos duda, establecen términos para resolver procedimientos administrativos, por lo tanto son simplemente directivos. Su incumplimiento no le resta validez o eficacia a los dictámenes emitidos por el organismo administrativo luego de haber expirado.
El cuarto error no merece discusión alguna. Basta con aclarar que el mismo sólo plantea los remedios a los que hubiesen tenido derecho los empleados recurrentes de nosotros haber concluido que hubo discrimen político. No siendo esa nuestra determinación, resulta innecesario expresarnos sobre el mismo.
Por los fundamentos antes esbozados, confirmamos la resolución recurrida por considerar que no se cometieron los errores apuntados.
*1244 Lo acuerda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 98DTA119
1. "§711g. Status de los empleados

Se dispone que todo trabajador irregular empleado por el Gobierno del Estado Libre Asociado de Puerto Rico, de conformidad con las disposiciones de las sees. 711 a 711g de este título, adquirirá la condición de empleado regular del Servicio por Oposición al amparo de la Ley Núm. 345 de 12 de mayo de 1947, según enmendada conocida como Ley de Personal, de acuerdo con los siguientes requisitos:

(a) Que haya prestado servicios continuos al Gobierno del Estado Libre Asociado por espacio de tres (3) años o más, en una agencia. Disponiéndose, que 1,800 horas o más de servicios prestados en un año fiscal se considerarán como un año de servicios.

En aquellos casos en que se reduzca el horario de la jornada de trabajo del personal irregular en virtud de las disposiciones de una ley estatal y/o en cumplimiento de las disposiciones federales sobre salario mínimo, el Director de la Oficina Central de Administración de Personal determinará el número de horas equivalentes a un año de servicios.

La equivalencia antes indicada se determinará considerando las horas de servicio que podrían prestarse en un año fiscal en base a la jornada completa de trabajo que resulte como consecuencia de la reducción del horario.

(b) Que posea los requisitos mínimos de preparación y experiencia establecidos para la clase de puesto a la cual se asignen las funciones que éste venía desempeñando, y

(c) que el jefe de la agencia en la cual presta sus servicios certifique al Director de Personal que ha prestado servicios satisfactorios, conforme a las normas adoptadas por éste.

2. La Ley de Procedimiento Administrativo Uniforme tiene un claro ejemplo de esta situación. Establece que si una agencia acoge una moción de reconsideración, pero no la resuelve en un término de noventa (90) días pierde su jurisdicción para atenderla. 3 L.P.R.A. see. 2165. (Supl. 1997).